667 F.Supp. 1298 (1987)
UNITED STATES of America, Plaintiff,
v.
Russell M. BLISS, et al., Defendants.
No. 84-200C(1).
United States District Court, E.D. Missouri, E.D.
August 7, 1987.
*1299 *1300 *1301 Jill Newman & Joseph Moore, Asst. U.S. Attys., St. Louis, Mo., F. Henry Habicht, II, Steven R. Baer, John R. Barker, Mark E. Grummer, Brian G. Donohue, U.S. Dept. of Justice, James J. Kohanek, U.S. Environmental Prot. Agency, Washington, D.C., *1302 Cheryle Micinski, Asst. Regional Counsel, U.S. Environmental Prot. Agency, Kansas City, Kan., for plaintiff.
Eric B. Rothenberg, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for Saddle & Spur Club, Inc.
John J. Cole, St. Louis, Mo., Joseph M. Spivey, III, Louis T. Booker, William B. Ellis, Richmond, Va., for all Syntex Companies.
F. Wm. McCalpin, Richard A. Ahrens, Lewis & Rice, St. Louis, Mo., for defendant Ind. Petro. Corp.
Ted L. Perryman, St. Louis, Mo., for defendants N.E. Pharm. & Chem. Co., Edwin Michaels and John Lee.
Russell & Evelyn Bliss, pro se.
Jerry R. Bliss, pro se.

MEMORANDUM
NANGLE, Chief Judge.
This case is now before this court on the motion of the plaintiff United States for partial summary judgment. In this action, the United States seeks injunctive relief and recovery of clean-up costs under sections 106 and 107 of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9606 and 9607, and section 7003 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6973, in connection with six sites in the Eastern District of Missouri. As the United States alleges, these sites are contaminated by the hazardous substances 2, 3, 7, 8 -tetra chlorodibenzo-p-dioxin (dioxin) and trichlorophenol (TCP) and threaten the public health and environment.
By the instant motion, the United States seeks partial summary judgment against defendants Northeastern Pharmaceutical and Chemical Company, Inc. (NEPACCO); NEPACCO's president, Edwin Michaels; NEPACCO's vice-president, John Lee; Independent Petrochemical Corp. (IPC); Russell Martin Bliss; and Jerry-Russell Bliss, Inc.[1] Specifically, the United States asks this Court to find that these defendants are 1) jointly and severally liable under section 107(a) of CERCLA; 2) responsible parties subject to joint and several liability under section 106(a) of CERCLA upon a future showing of endangerment; and 3) contributors subject to joint and several liability under section 7003(a) of RCRA upon a future showing of endangerment. For the reasons set out below, the motion of the United States is granted as to section 107(a) of CERCLA and denied as to section 106(a) of CERCLA and section 7003(a) of RCRA.

I. FACTS
In late 1969, NEPACCO leased from Hoffman-Taff, Inc., portions of an existing manufacturing facility located near Verona, Missouri, and purchased from Hoffman-Taff manufacturing equipment located there. Hoffman-Taff had used the facility previously to manufacture the defoliant Agent Orange. The equipment purchased included at least one of two black, insulated 7500-gallon tanks previously used in the manufacture of Agent Orange.
NEPACCO used the facility to manufacture hexachlorophene, the desired product. The chemical manufacturing process used by NEPACCO also produced dioxin and TCP, the undesired products. In one of the tanks purchased from Hoffman-Taff, NEPACCO stored some of the undesired products from the manufacturing process, including dioxin and TCP.
From 1969 to 1972, Edwin Michaels was the president, a director, and a stockholder of NEPACCO. During this same time, John Lee served as the vice-president and a director of NEPACCO and held stock in the corporation.
*1303 From 1970 through 1972, Gregory Browne served as the St. Louis District Manager of IPC. During that time, IPC supplied certain solvents to NEPACCO. From this relationship, Browne learned of NEPACCO's need to dispose of materials accumulating in the black, insulated tank.
During 1971, NEPACCO, Michaels, and Lee arranged with Gregory Browne the disposal of the liquid materials in the black, insulated tank. Both Michaels and Lee met personally with employees of IPC to arrange for the disposal of the materials. Browne, in turn, arranged for Russell Martin Bliss to carry out the disposal of the tank materials. Pursuant to this arrangement, Bliss picked up at least five tank truck truckloads from the Verona plant between February and October of 1971. Each load contained approximately 3000 to 3500 gallons of material. Bliss billed IPC for these services. IPC billed NEPACCO, charging a larger amount for disposal than Bliss charged IPC.
On each trip, Bliss or a Bliss employee would drive a truck to Verona and load the truck from the insulated tank. With the exception of one or perhaps two loads, the waste materials were then delivered to Bliss' facility near Frontenac, Missouri. These materials were then placed in storage tanks at the Bliss facility. Subsequently, Bliss or his employees reloaded his trucks with material from his storage tanks and sprayed that material at a number of sites within this district. The materials, referred to as still bottom residues by NEPACCO and as waste oil or acid oil by Bliss and IPC, were sprayed at the sites to suppress dust. These sites include four stables or horse arenas: the Saddle and Spur Club, Shenandoah Stables, Timberline, and Bubbling Springs. On one return trip from Verona, Bliss sprayed part of his load along a road and on a horse ring at his farm near Rosati, Missouri. Thus, these materials did not reach the Frontenac facility.
During the relevant time period, Bliss was receiving oil from one to two thousand sources, primarily crankcase oil from service stations. This oil was also placed in one or two storage tanks at Frontenac. The majority of this oil was drained from these tanks, loaded onto either of Bliss' tank trucks, and taken to refineries. Oil was placed into and drained from the two storage tanks on a daily basis.
Soil samples were taken by the Environmental Protection Agency at Rosati, Frontenac, and the four horse arenas. Analyses of these samples reveal the presence of dioxin and/or TCP at each site and confirm that dioxin and/or TCP were released there.
The United States has incurred response costs in connection with the release of dioxin and/or TCP at the six sites in this action.
Jerry-Russell Bliss, Inc. is the successor in liability to the activities of Russell Martin Bliss.

II. DISCUSSION
The United States seeks partial summary judgment under three statutory provisions: sections 106(a) and 107(a) of CERCLA and section 7003(a) of RCRA. The appropriate standard for summary judgment under Fed.R.Civ.P. 56 and the standards for imposition of liability under these statutes are discussed below.

A. Fed.R.Civ.P. 56
Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted if the moving party can "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). In passing on a motion for summary judgment, a court must view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the facts. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 1356-57, 89 L.Ed.2d 538 (1986). The burden of proof is on the moving party, and a court should not grant summary judgment unless convinced that there is no evidence to sustain a recovery *1304 under any circumstance. Foster v. Johns-Manville Sales Corp., 787 F.2d 390, 392 (8th Cir.1986). Nevertheless, a party opposing a motion for summary judgment may not rest upon the allegations of the pleadings but "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see also 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2739 (1983). Thus, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 106 S.Ct. at 1356.

B. Section 107(a) of CERCLA
In 1980, Congress enacted CERCLA as a comprehensive response to the problems of hazardous waste. Through the Act, Congress intended to provide the federal government with a prompt and effective response to hazardous waste problems and to force those responsible for creating hazardous waste problems to bear the cost of their actions. Violet v. Picillo, 648 F.Supp. 1283, 1288 (D.R.I.1986). The Act authorized federal district courts to grant injunctive relief to protect public health and to facilitate clean-up activities. 42 U.S.C. § 9606. The Act also created a "Superfund" to finance clean-up activities and provided the federal government with a cause of action to recover clean-up costs. 42 U.S.C. §§ 9604 and 9607.
CERCLA authorizes the United States to sue to recover for damage to natural resources and for "all costs of removal or remedial action." 42 U.S.C. § 9607(a). CERCLA does not identify expressly the elements of a prima facie case of liability for clean-up costs. Instead, the statute merely lists classes of potentially liable parties, 42 U.S.C. § 9607(a), and provides three causation-based defenses, 42 U.S.C. § 9607(b). See generally Developments in the Law-Toxic Waste Litigation, 99 Harv.L.Rev. 1459, 1520 (1986). From this list of potentially liable parties, the elements of a prima facie case may be derived. To establish liability under CERCLA, the United States must establish the following:
1) each of the sites is a "facility";
2) a "release" or a "threatened release" of a "hazardous substance" from the sites has occurred or is occurring;
3) the release or threatened release has caused the United Staes to incur response costs; and
4) the defendants fall within at least one of the classes of liable persons described by sections 107(a)(1)-(a)(4).
United States v. Conservation Chemical Co., 619 F.Supp. 162, 184 (W.D.Mo.1985). Liability under CERCLA is strict, without regard to the liable party's fault or state of mind. New York v. Shore Realty Corp., 759 F.2d 1032, 1044 (2d Cir.1985); Violet, 648 F.Supp. at 1290; United States v. Conservation Chemical Co., 619 F.Supp. at 204; United States v. Ward, 618 F.Supp. 884, 893 (E.D.N.C.1985); United States v. Northeastern Pharmaceutical and Chemical Co., 579 F.Supp. 823, 844 (W.D.Mo. 1984). (NEPACCO), rev'd on other grounds, 810 F.2d 726 (8th Cir.1986).[2]
CERCLA provides only three defenses to liability. A party against whom a prima facie case has been established will not be liable if the party "can establish by a preponderance of the evidence that the release of a hazardous substance and the damages resulting therefrom were caused solely by  (1) an act of God; (2) an act of war; [or] (3) an act or omission of a third party." 42 U.S.C. § 9607(b). The defendants have suggested they might raise these defenses but have not presented facts to support their use.[3] Therefore, the defendants *1305 have failed to sustain their burden of establishing one of the statutory defenses. Thus, the issue for resolution is whether the United States has established a prima facie case of liability.

1. Facility
The Court must determine first whether the sites in question are facilities, as that term is defined in CERCLA. Section 101(9) of CERCLA defines "facility" broadly, encompassing far more than traditional dumpsites. 42 U.S.C. § 9601(9); New York v. General Electric Co., 592 F.Supp. 291, 196 (N.D.N.Y.1984).[4] The definition includes both the container from which a hazardous substance has been released and the site where those hazardous substances have been placed. As the Special Master noted succinctly in United States v. Conservation Chemical Co., 619 F.Supp. at 185, "simply put, the term `facility' includes any place where hazardous substances come to be located." Thus, to show that an area is a "facility", the plaintiff need only show that a hazardous substance has been placed there or has "otherwise come to be located" there.
Both dioxin and TCP are hazardous substances as defined by CERCLA. 42 U.S.C. § 9601(14).[5] Sampling and analysis performed by the EPA confirm the presence of dioxin and TCP at the six sites at issue. Thus, these sites are facilities for purposes of liability under CERCLA.
As the defendants argue, the United States has failed to present competent evidence of the presence of dioxin at the sites. In particular, the defendants note that the affidavit of Dr. Robert Kleopfer is made upon "knowledge, information, and belief", not upon personal knowledge. Without conceding the inadequacy of Kleopfer's affidavit, the United States has supplemented the record with portions of Kleopfer's deposition  in which the defendants participated  and the results of laboratory analyses performed upon samples taken from each site. These materials demonstrate that dioxin and TCP are present at the sites. The defendants have introduced no materials to indicate otherwise.

2. Release
The Court must next consider whether a release of a hazardous substance has occurred. Section 101(22) of CERCLA defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment" of a hazardous substance. 42 U.S.C. § 9601(22). Bliss' activities and the presence of dioxin and TCP in soil at the six sites constitute a release at the six sites.

3. Response Costs
The affidavit of Doris Finlay, an EPA environmental protection specialist, indicates that the EPA has spent over $1.5 million from the Superfund for clean-up *1306 actions authorized by section 104(a) of CERCLA in connection with the six sites herein. This evidence satisfies the third element of liability under section 107 of CERCLA.[6]

4. Liable Parties
In addition to the above three elements common to any party potentially liable under section 107 of CERCLA, the United States must establish that the party falls within at least one of the four classes described in a 107(a)(1)-(4). Briefly, these classes include 1) current owners and operators of hazardous waste facilities; 2) past owners and operators of hazardous waste facilities; 3) those who arrange for disposal of hazardous waste; and 4) transporters of hazardous waste.

a. NEPACCO, Michaels, and Lee
The United States seeks to impose liability upon NEPACCO, Michaels, and Lee under section 107(a)(3) as parties who arranged for disposal of hazardous substances. These defendants will be referred to collectively as the "NEPACCO defendants."
The undisputed facts establish that the NEPACCO defendants arranged for the disposal of the materials in the black, insulated tank at the NEPACCO plant. For purposes of this motion, it is immaterial whether the dioxin and TCP present in the waste were generated by NEPACCO in its manufacturing of hexachlorophene or the earlier production of Agent Orange by Hoffman-Taff because section 107(a)(3) encompasses both generators of waste and those who merely arrange for the disposal of waste. See Ward, 618 F.Supp. at 890 and 894-95 (liability based upon arrangements for disposal); NEPACCO, 579 F.Supp. at 847-50 (same); United States v. Mottolo, 629 F.Supp. 56, 60 (D.N.H.1984) (same).
As defendants Lee and Michaels argue, they may not be held liable for the acts of the corporation respecting disposal of the waste. The defendants admit that they might be liable for arrangements made as individuals but deny that they made any such arrangements regarding the waste. As Michaels and Lee further argue, they cannot be held liable because they did not own or possess the waste.
The defendants do not cite the opinion of the Eighth Circuit in United States v. NEPACCO, 810 F.2d 726 (8th Cir.1986). In NEPACCO, defendant Lee raised the arguments raised here by both Michaels and Lee. The Eighth Circuit rejected the argument that legal title to the waste was necessary, focusing instead upon the "authority to control the handling and disposal of hazardous substances." NEPACCO, 810 F.2d at 743-44. The Court also held that Lee could be held liable without "piercing the corporate veil" of NEPACCO. NEPACCO, 810 F.2d at 744. The Court predicated Lee's liability upon his personal involvement in the CERCLA violations committed by NEPACCO. Id.
Here, Lee, as plant supervisor, and Michaels, as the chief executive officer, had ultimate authority for decisions regarding disposal. Moreover, both Michaels and Lee exercised their authority when they met with IPC representatives to arrange for disposal of the waste. Thus, their individual acts place them within the class of liable persons under section 107(a)(3) of CERCLA.

b. IPC
As the United States argues, the acts of IPC regarding the NEPACCO waste place IPC within the class of liable persons described by section 107(a)(3) of CERCLA. The United States bases liability upon both the arrangements between IPC and the NEPACCO defendants and the arrangements between IPC and Bliss.
To be liable under section 107(a)(3) a person need not have generated the hazardous substance. E.g., Ward, 618 F.Supp. at 890 and 894-95. Also, under the broad *1307 interpretation accorded to section 107(a), a party need not have actual ownership or possession of the waste to fall within the scope of that section. NEPACCO, 579 F.Supp. at 847-48; Mottolo, 629 F.Supp. at 60; see also NEPACCO, 810 F.2d at 743 (control critical to determining liability).
Essentially, IPC acted as a broker between a chemical manufacturer and a disposal company. Under its arrangement with NEPACCO, IPC had authority to control the place and manner of disposal; for example, IPC could have chosen Bliss or any other party to dispose of the waste. Thus, this Court finds IPC liable under section 107(a)(3) of CERCLA.

c. Russell Martin Bliss
The United States seeks to hold Russell Martin Bliss liable under three of the four classes described by section 107(a). Regarding section 107(a)(1), Bliss' liability is based upon the release of hazardous wastes at the six sites from a facility, namely his trucks, which are facilities under the broad definition of that term. Regarding section 107(a)(2), Bliss' liability is based upon the disposal of hazardous wastes at the Frontenac tank farm, a facility he owned and operated at the time of the disposal. Also, Bliss owned the Rosati farm site at the time of the disposal there. Regarding section 107(a)(4), Bliss, operating as Bliss Waste Oil Company, accepted, transported, and disposed of the dioxin and TCP at the six sites. The above facts support a finding of liability under the respective sections of CERCLA. It should be noted that liability under section 107(a)(2) applies only to the Rosati and Frontenac while liability under sections 107(a)(1) and 107(a)(4) applies to all six sites.[7]

d. Jerry-Russell Bliss, Inc.
The United States seeks to hold Jerry-Russell Bliss, Inc. liable under section 107(a)(1), (2), and (4) as the successor in interest to Russell Martin Bliss, doing business as Bliss Waste Oil Company. The United States relies upon an earlier judgment of the Missouri Supreme Court and the doctrine of issue preclusion.
Under the Full Faith and Credit Statute, 28 U.S.C. § 1738, federal courts must give to a state court judgment the same preclusive effect as would the state's own courts. Migra v. Warren City School District Bd. of Ed., 465 U.S. 75, 85, 104 S.Ct. 892, 898, 79 L.Ed.2d 56 (1984). Thus, this Court must apply to the Missouri judgment the same issue preclusion standards as a Missouri court.
In Tyler v. Harper, 744 F.2d 653, 655 (8th Cir.1984), cert. denied, 470 U.S. 1057, 105 S.Ct. 1767, 84 L.Ed.2d 828 (1985), the Eighth Circuit set out the application of offensive issue preclusion under Missouri law:
In Missouri, the appropriateness of the application of collateral estoppel by a stranger to the prior suit is to be determined on a case-by-case basis. The court is to consider whether: (1) the issue decided in the prior adjudication is identical to the issue in the present action; (2) the prior adjudication resulted in a judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit. Oates v. Safeco Insurance Co. of America, 583 S.W.2d 713, 719 (Mo.1979) (en banc); Retirement Board of the Police Retirement System v. Noel, 652 S.W.2d 874, 877-78 (Mo.Ct.App.1983).
In Jerry-Russell Bliss, Inc. v. Hazardous Waste Management Comm., 702 *1308 S.W.2d 77 (Mo.1986), the Supreme Court of Missouri affirmed the decision of a lower court upholding an administrative ruling of the Missouri Hazardous Waste Management Commission. The decision of that Commission, rendered after an administrative adjudicatory hearing, denied the application of Jerry-Russell Bliss, Inc., for a hazardous waste transporter's license. In affirming the Commission's decision, the Supreme Court addressed the issue of successor liability:
Petitioner contends the circuit court erred in upholding the Commission's finding that the liabilities and disabilities of Bliss Waste Oil Company, its principals and its employees are attributable to petitioner for the purpose of determining its qualifications for a hazardous waste transporter's license. The general rule is that where one corporation sells, or otherwise transfers, its assets to another corporation, and the circumstances are such that the purchasing corporation is a continuance of the selling corporation, the purchasing corporation ipso facto is liable for the debts and liabilities of the selling corporation. Ingram v. Prairie Block Coal Co., 319 Mo. 644, 5 S.W.2d 413, 416 (1928); Brockmann v. O'Neill, 565 S.W.2d 796 (Mo.App.1978). This same rule appertains where a new corporation succeeds an unincorporated association. Citizens Mut. Fire & Lightning Ins. Soc. v. Schoen, 105 S.W.2d 43 (Mo. App.1937); Taylor v. American Mut. Ass'n., 229 Mo.App. 284, 77 S.W.2d 865 (1935).
Prior to 1978, the Bliss Waste Oil Company was owned and operated by Russell and Evelyn Bliss; their son, Jerry Bliss, was an employee of their business. When the business was incorporated in 1978 Russell, Evelyn, and Jerry Bliss, became the officers, directors and sole shareholders of petitioner. The business operations remained the same after incorporation. The office, trucks, employees and customers of petitioner are the same as those of Bliss Waste Oil Company. Petitioner represented itself to be a continuation of the Bliss Waste Oil Company, advertising on its letterhead that it had been in business for over forty years; and advertised itself as "Bliss Oil, Inc." on the side of at least one of its trucks. This was sufficient to show that petitioner was a continuation of Bliss Waste Oil Company and, as such, responsible for the actions of the latter, its principals and its employees.
This opinion represents a final adjudication of the successor liability issue on its merits after a full and fair opportunity to litigate the issue.[8] Thus, Jerry-Russell Bliss, Inc., is liable under section 107(a)(1), (2), and (4) as the successor to the business of Russell Martin Bliss.

5. Defendants' Arguments
Initially, this Court rejects the defendants' suggestions that complexity alone is a sufficient reason to deny summary judgment. Rule 56 itself creates no exception for complex cases, and the Supreme Court has upheld summary judgment in the most convoluted litigation. E.g. Matsushita, 106 S.Ct. at 1351 (protracted antitrust litigation). Of course, some issues such as intent are less susceptible to resolution on summary judgment. However, the instant case presents no such issues. Under CERCLA, liability is strict, requiring no inquiry into state of mind. And though the analysis of hazardous substances and the problems posed by their *1309 clean-up may be at the frontier of technical abilities, the elements of a prima facie case are relatively straightforward. Indeed, a number of courts have found Rule 56 the appropriate procedural mechanism for disposition of the issue of liability under CERCLA. E.g., Conservation Chemical, 619 F.Supp. at 175; Ward, 618 F.Supp. at 898; United States v. South Carolina Recycling and Disposal, Inc., 653 F.Supp. 984, 990 (D.S.C.1984) (SCRDI).
The defendants have raised numerous other arguments in opposition to the motion for partial summary judgment. A number of these arguments are addressed above. Four arguments merit independent discussion. These arguments concern the standard of causation under CERCLA, the adequacy of the time afforded the parties for discovery, the competency of Bliss' deposition testimony, and the application of joint and several liability under CERCLA.
First, IPC and the NEPACCO defendants argue that material issues of fact remain regarding causation. As the defendants assert, the United States has not established that the hazardous substances stored at the NEPACCO facility and transported by Bliss are the hazardous substances which caused the United States to incur response costs at the six sites. In other words, the possibility exists that the substances at the sites are not the same ones disposed of by the defendants. This argument relies upon alleged factual gaps between Bliss' picking up the wastes in Verona and his spraying of the horse arenas.[9] The defendants' argument calls for a brief reiteration of the facts.
After picking up the waste in Verona, Bliss brought the truckloads to the Frontenac facility. There, the trucks were unloaded into either of two storage tanks. During the relevant time period, Bliss received oil from one to two thousand sources, primarily crankcase oil from service stations, and placed the oil in these same two tanks. The majority of this oil was drained from these tanks, loaded onto either of Bliss' two tank trucks, and taken to refineries. Oil was placed into and drained from the two storage tanks on a daily basis. Several loads of material were drained from these tanks and used to spray at least four horse arenas to control dust.
Based on these facts, the defendants argue that none of their waste ended up at the horse arenas. As they speculate, at the time Bliss sprayed each arena, any Verona waste previously placed in the tank had been withdrawn and delivered to refineries. Unless the government demonstrates a closer connection between the NEPACCO waste and the horse arenas, the defendants argue, the government would need to show only that a party produced dioxin in order to shift the burden to the defendant to show that the dioxin found at a site was not its own. In response, the government argues that it has met the weak causation standard required by CERCLA by showing that dioxin and TCP were delivered to the Frontenac tanks, that thereafter oil withdrawn from these tanks was sprayed at the four horse arenas, and that dioxin and TCP are present at these sites.
CERCLA does not set out an express standard of causation. Nevertheless, structure of CERCLA and its legislative history make it clear that traditional tort notions, such as proximate cause, do not apply. United States v. Wade, 577 F.Supp. 1326, 1332-33 (E.D.Pa.1983) (Wade I).[10] Moreover, the practical limits on analytic techniques argue for a weaker causation standard. In particular, the co-mingling and migration of wastes at a disposal site makes identification of sources scientifically difficult and economically infeasible. Wade I, 577 F.Supp. at 1332-33 (E.D.Pa. 1983); SCRDI, 653 F.Supp. at 993 n. 6 (identification of all waste types in the conglomerate *1310 of materials at the dumpsite would cost approximately five times the cost of removal). As the Wade court concluded, "to require a plaintiff under CERCLA to `fingerprint' wastes is to eviscerate the statute." Wade I, 577 F.Supp. at 1332-33. Thus, CERCLA requires only a relaxed standard of causation.
The problem of causation has been addressed most often in the case of generators of hazardous wastes. After leaving a generator's plant, the wastes may be transferred through several intermediaries, some of whom are unknown to the generator, before the ultimate disposal of the waste. After disposal, the wastes may migrate and mingle with the wastes of others. Therefore, in the case of generators, courts have required only a weak showing of causation. To establish liability, a plaintiff must prove the following:
1) that the generator disposed of hazardous substances; 2) at a facility which contains at the time of discovery hazardous substances of the kind the generator disposed; 3) there is a release or a threatened release of that or any hazardous substance; 4) which triggers the incurrence of response costs.
Violet, 648 F.Supp. at 1289; Conservation Chemical, 619 F.Supp. at 190; United States v. Ottati & Goss, Inc., 630 F.Supp. 1361 (D.N.H.1985); SCRDI, 653 F.Supp. at 991-92; Wade I, 577 F.Supp. at 1333. Under this standard, the plaintiff need not trace the wastes found at the site back to the wastes deposited by the defendant. For example, in Ottati & Goss, the district court held certain generators liable for response costs based upon drums of waste deposited at the site, some of which drums had leaked their contents into the soil. The court held the generators liable without additional proof as to whose drums had leaked.
In the above cited cases, the defendants could have asserted the "third party defense" by identifying the leaking drums as those of a third party. Thus, upon a showing that the defendant's wastes were delivered to a site, the above standard, in effect, shifts the burden of tracing the sources of the released hazardous substance to the defendant. Such a defendant bears the risk that its wastes will become unidentifiable. The same result should obtain whether the wastes have become unidentifiable due to mixing, migration, or mismanagement. So, for example, if random, unidentifiable drums are removed from the original dumpsite and placed at a new site by the disposal company, the generators of the waste would be liable for response costs incurred at the second site.
Despite the relaxed standard of causation, liability under section 107(a)(3) of CERCLA is not boundless. A second opinion in the Wade litigation illustrates well the limits of liability under CERCLA. In United States v. Wade, 21 E.R.C. 1347 (E.D.Pa.1984) (Wade II), the court dismissed arguments that liability could be based upon the mere transfer of hazardous substances to a disposal company which had placed other wastes at the dumpsite at issue. There, the generator defendants counterclaimed for contribution from the United States. As the generators alleged, a Navy facility had produced hazardous substances and transferred them to a company which had disposed of the generators' wastes at the site. In support of its motion for summary judgment on the counterclaim, the United States offered proof that the waste in fact had not been delivered to that site but to another unrelated site. The generator defendants contested the competency of this evidence and offered evidence that the waste had been disposed of at the site at issue. The court denied the government's motion for summary judgment to permit the defendants to develop at trial the link between the Navy facility and the site. However, in denying the motion, the court rejected the generator defendants' argument that causation could be shown merely by demonstrating that the Navy transferred its waste to the disposal company which had deposited other waste there. Wade II, 21 E.R.C. at 1348.
The instant case does not fit precisely within the pattern of dumpsite litigation. Nevertheless, the principles discussed *1311 above apply equally well. Here, the difficulty in tracing the wastes arises not because the wastes mixed at a common dumpsite; rather, difficulties arise because intermediate parties became involved and because Bliss emptied his loads from Verona into his holding tanks. In the tanks at Frontenac, the Verona wastes mixed with oil from Bliss' other customers.[11] That some unidentifiable mixture was later withdrawn from these tanks and sprayed at the horse arenas does not create an issue of fact regarding causation. In light of the cases discussed above, the defendants, not the plaintiff, bear the burden of showing that the hazardous substances at the site came solely from a third party.[12]
Wade II does not support the instant defendants' arguments regarding causation. In Wade II, the United States offered evidence that its barrels of waste were delivered to another site. Thus, there remained a possibility that a discrete amount of the materials handled by the disposal company were not taken to the site at issue. Here, Bliss mixed the Verona wastes with wastes from other sources, eliminating the possibility of tracing a discrete amount of the waste.[13] In this regard, Wade I, standing for the principle that the defendant bears the burden of tracing the waste, has greater bearing on the instant case.
The defendants assert that imposition of liability upon them with such a weak showing of causation would violate principles of fairness and would be contrary to the purposes of strict liability. On the contrary, the above standard of causation furthers the Congressional goals of imposing cleanup costs upon industries handling hazardous substances and spreading cost among parties within the industry. Any seeming unfairness may be mitigated by permitting the defendants to sue other potentially liable parties for contribution.
Second, the NEPACCO defendants assert that they need more time to complete discovery. To this end, the NEPACCO defendants have moved for more time to conduct discovery under Fed.R.Civ.P. 56(f). In support of this motion, the NEPACCO defendants have submitted the affidavit of their counsel. This affidavit states, in part, that discovery has been stayed from shortly after the filing of the complaint until March 1986 and that since that time the defendants' counsel have been engaged in other complex litigation, preventing discovery in this case.
Summary judgment may not be granted if the non-moving party has had inadequate time to conduct discovery. See Celotex Corp. v. Catrett, 477 U.S. 317, ___, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986) (summary judgment may be granted after adequate time for discovery). This rule prevents the possibility that no genuine issue has been presented merely because the non-moving party has had inadequate time to investigate the facts.
A review of the record reveals the following facts relevant to discovery: On January 20, 1984, the United States filed its *1312 complaint along with certain discovery requests. On March 13, 1984, the Syntex defendants moved to stay discovery by the United States against the Syntex defendants, pending resolution of their motion to dismiss for lack of personal jurisdiction. Such a stay was granted on April 16, 1984, and modified on April 18, 1984, to permit limited discovery by the United States against the Syntex defendants on the personal jurisdiction issue. This stay was lifted on March 20, 1986.
Since the filing of the complaint, the United States conducted discovery against the defendants, including the depositions of Russell Martin Bliss on October 26, 1984; defendants Michaels and Lee during the week of April 22, 1985; and employees and officers of IPC from December 1985 through May 1986. During this period, the defendants took discovery against the United States, including the deposition of Dr. Kleopfer in the related case of Wehner v. Sytnex Corp., No. 83-642 (E.D.Mo. filed Mar. 16, 1983), in February and May 1985. Counsel for IPC was present at both depositions of Kleopfer; counsel for NEPACCO did not attend the May deposition.
The only stay against discovery by NEPACCO resulted from the order of Judge Filippine in October 1986, consolidating cases in this district for discovery and staying further discovery until a schedule could be developed. Thus, from January 1984 through October 1986, the NEPACCO defendants could have been and were conducting discovery. Counsel's affidavit is simply incorrect to the extent it suggests that discovery was stayed during this period. The period allowed is more than adequate to conduct the necessary discovery; any delay in discovery is due solely to a lack of diligence.
Defendants' counsel submits that more discovery must be conducted to determine other potential sources of the hazardous waste. Given the above discussion of causation, such discovery is relevant only to a suit for contribution and need not delay the disposition of the present motion.
Also, the defendants' counsel seeks more time to investigate the "type, nature and amount" of the waste at each site. Under CERCLA, the amount of waste is relevant only to the issue of damages. Regarding discovery as to the "type and nature" of waste, counsel's statement can be described at best as disingenuous. It is incredible that more than three years after the filing of the complaint, after reams of pleadings have been filed and documents exchanged, and after the deposition of the EPA official in charge of identifying hazardous substances, the defendants do not know whether hazardous substances are indeed present at the sites. The analyses presented by the government establishes the presence of hazardous waste at the sites. Additional investigations of this sort are not relevant to the issue of liability.
Third, IPC asserts that the deposition statements of Bliss may not be relied upon because, as a convicted felon, his credibility is at issue and must be evaluated at trial. First, the defendants do not offer any evidence which calls into question Bliss' testimony regarding the facts essential to establish liability. Second, Bliss' conviction for tax evasion is unrelated to the present issues, and the statements upon which the United States relies are statements against Bliss' own interests. Third, Bliss' deposition testimony is corroborated by invoices from Bliss Waste Oil Service to IPC and the testimony of Gregory Browne, upon which government also relies. Therefore, the defendants have not raised doubts concerning Bliss' testimony which must be resolved through evaluation of live testimony.
Finally, as the NEPACCO defendants contend, the issue of whether the defendants are liable jointly and severally cannot be determined on the instant motion. This Court disagrees and concludes that the defendants have failed to sustain their burden of demonstrating that the harm resulting from the release of the Verona wastes is divisible.
The issue of joint and several liability under CERCLA must be determined on a case-by-case basis. United States v. Chem-Dyne Corp., 572 F.Supp. 802, 810-11 *1313 (S.D.Ohio 1983); accord United States v. Miami Drum Services, Inc., 25 E.R.C. 1469 (S.D.Fla.1986) [Available on WESTLAW, DCT database]; Conservation Chemical, 589 F.Supp. at 62-63; NEPACCO, 579 F.Supp. at 845. The Chem-Dyne decision adopts the traditional common law rule regarding joint and several liability. Thus, under Chem-Dyne, the defendant bears the burden of proving that the harm resulting from the defendants' concerted conduct is capable of apportionment among those who have violated CERCLA. Chem-Dyne, 572 F.Supp. at 810-11.
Here, the NEPACCO defendants have failed to sustain this burden. Each of the defendants contributed in some degree to the release of the hazardous substances and the incurrence of response costs, and the defendants have offered no rational basis for apportionment of this harm. Accordingly, this Court holds each and all the defendants addressed by this motion jointly and severally liable under section 107(a) of CERCLA.

C. Section 7003(a) of RCRA and Section 106 of CERCLA
Originally passed in 1976, the Resource Conservation and Recovery Act responds to a need to manage hazardous wastes and to encourage the conservation and recovery of valuable resources. H.Rep. No. 1491, 94th Cong. 2d Sess. 1, reprinted in 1976 U.S.Code Cong. & Admin.News 6238-39. Section 7003(a) of RCRA provides the United States with "the right to seek judicial relief or to take other appropriate action to avert imminent and substantial threats to the environment or public health." United States v. Price, 523 F.Supp. 1055, 1070 (D.N.J.1981), aff'd, 688 F.2d 204 (3rd Cir.1982). Section 7003(a) of RCRA imposes liability without fault or negligence and applies to present conditions resulting from the past activities of past off-site generators and transporters. NEPACCO, 810 F.2d at 740. Liability is not limited to generator transporters but includes any person who contributed to improper disposal. See H.R.Rep. No. 1133, 98 Cong., 2d Sess., 130 Cong.Rec. H. 11137 (October 3, 1984); S.Rep. No. 172, 96th Cong., 2d Sess. 5 (1980), reprinted in 1980 U.S.Code Cong. & Admin.News 5019, 5023 ("contributing to" more liberal than common law liability); Price, 523 F.Supp. at 1073.
To establish a prima facie case of liability under section 7003(a), the government must establish three elements: 1) that the conditions at the site present an imminent and substantial endangerment; 2) that the endangerment stems from the handling, storage, treatment, transportation, or disposal of any solid or hazardous waste; and 3) that the defendant has contributed or is contributing to such handling, storage, treatment, transportation, or disposal. 42 U.S.C. § 6973.
Similarly, section 106(a) of CERCLA authorizes district courts to grant injunctive relief to abate "imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility." 42 U.S.C. § 9606(a). Liability under section 106(a) rests upon a finding that the defendant falls within one of the classes of liable parties described by section 107(a)(1)-(4). See Conservation Chemical, 619 F.Supp. at 184 (section 107(a) identifies both those persons liable under section 104 and section 106 of CERCLA); United States v. Outboard Marine Corp., 556 F.Supp. 54, 57 (N.D.Ill.1982) ("[I]t is most probable that those who would be liable under section 107 were intended to be liable in an action under 106(a) for injunctive relief.") Thus, to establish a prima facie case under section 106(a) the government must establish the elements required by section 107(a) and, in addition, show that the hazardous substances pose an "imminent and substantial endangerment" to the public health, welfare, or the environment.
The United States has sought only a finding of liability under section 106(a) and section 7003(a) upon a further finding of endangerment. This approach does not further the interests of judicial economy and calls upon this Court to make potentially unnecessary findings. Though some of *1314 the elements of liability under sections 106(a) and 7003(a) overlap with those of section 107(a), a finding of endangerment requires the Court to evaluate the nature and degree of the risk posed by the hazardous substances. See H.R.Rep. No. 1185, 93d Cong., 2d Sess. 35-36, reprinted in, 1974 U.S.Code Cong. & Admin.News 6454, 6487-88 (discussing meaning of endangerment under RCRA). This additional finding requires different and more complex evidence than a relatively simple finding of liability; yet, the parties and the Court may only speculate whether the government will proceed to make this additional showing. Thus, the Court need not address issues relating to liability under section 106(a) of CERCLA and section 7003(a) of RCRA. The Court notes that by deferring a decision on these issues the Court does not in any way prejudice the parties. To the extent the issues decided under section 107(a) of CERCLA overlap with those under section 106(a) of CERCLA or section 7003(a) of RCRA, the Court's decisions on those issues will become the law of the case, and the defendants will be estopped from relitigating those issues should the United States pursue liability under sections 106(a) or 7003(a).
In sum, this Court grants the motion of the United States for partial summary judgment under section 107(a) of CERCLA and finds NEPACCO, Michaels, Lee, IPC, Russell Martin Bliss, and Jerry-Russell Bliss, Inc., jointly and severally liable under section 107(a) of CERCLA. This Court denies the motion of the United States for partial summary judgment against these defendants under section 106(a) of CERCLA and section 7003(a) of RCRA without prejudice.
NOTES
[1] At this time, the United States does not seek judgment against other parties to this litigation, including Syntex Corporation and its subsidiaries. Originally, the United States included Charter International Oil Company (CIOC) in its motion. However, since the filing of the motion, the Bankruptcy Court for the Middle District of Florida approved a settlement of the federal government's claims against the corporate parents and affiliates of IPC, including CIOC. Subsequently, the United States dismissed its action in this Court against CIOC, Charter Oil Company, and The Charter Company.
[2] In the appeal taken from the district court's judgment in NEPACCO, the Eighth Circuit expressly reserved the issue of whether CERCLA imposes strict liability. Nevertheless, the Eighth Circuit noted that most courts had imposed strict liability. NEPACCO, 810 F.2d at 732 n. 3.
[3] Only the third defense, what may be called the "third party defense", is arguably applicable; however, this defense has important qualifications which limit its reach. First, the defense applies only to acts or omissions by a third party "other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant." 42 U.S.C. § 9607(b)(3). Here, it appears that the defendant's contractual relationships place them beyond the scope of the defense. Second, a defendant asserting the defense must establish that all due care was exercised and precautions against foreseeable acts or omissions taken in handling the hazardous substance. Thus, willful ignorance of how a third party disposes of a hazardous substance would preclude use of the defense. See Shore Realty Corp., 759 F.2d at 1048-49 (landlord could have reasonably foreseen tenant's dumping activities).
[4] Under Section 101(9) of CERCLA,

(9) "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.
[5] Section 101(14) of CERCLA defines hazardous substances by incorporating the definitions used by other federal statutes, including RCRA. Pursuant to Section 3001 of RCRA, the EPA promulgated regulatory criteria for identifying hazardous wastes. Identification and Listing of Hazardous Waste, 40 C.F.R. 261 (1986). Appendix VIII of those regulations identifies both dioxin and TCP as hazardous constituants forming hazardous wastes as defined by 40 C.F.R. 261.3 (1986).
[6] This opinion addresses only the defendant's liability and not the amount of damages. Thus, the Court does not decide whether any costs incurred are "not inconsistent with the National Contingency Plan." See 42 U.S.C. § 9607(a).
[7] In its brief in support of the motion for partial summary judgment, the United States seeks to hold Bliss liable under section 107(a)(3) for arrangements made with NEPACCO, independent of IPC. Though the NEPACCO defendants dispute the fact of those independent arrangements, both Bliss' deposition and IPC documents offer persuasive evidence of their existence. Nevertheless, in its reply brief, the United States declines to pursue a finding of liability under section 107(a)(3). Thus, this Court need not decide whether a genuine issue exists in this regard or whether Bliss is liable under section 107(a)(3) in addition to the other classes of section 107(a).
[8] Arguably, the issue of successor liability for purposes of CERCLA is an issue of federal, not state law, and therefore a state judgment of liability would not preclude relitigation of the issue in litigation under CERCLA. The possibility of varying standards of successor liability and the resulting inconsistent results under CERCLA argues in favor of a federal common law of successor liability under CERCLA. On the other hand, corporations are creatures of state law. The extent of their liabilities lies at the core of state regulation of their behavior but is only of derivative importance to CERCLA. This Court need not decide which law applies because the standards of successor liability in Missouri follow widely accepted common law principles and would be adopted by this Court if a federal common law of successor liability were developed under CERCLA. Thus, the issue decided by the Missouri Supreme Court  whether Jerry-Russell Bliss, Inc. is the successor in liability to Bliss Waste Oil Company and Russell Martin Blissis the same issue faced by this Court.
[9] The Rosati site was sprayed on a return trip from Verona, and the Frontenac site was contaminated by the handling and storage of the Verona wastes there. Thus, the causation argument does not relate to these sites.
[10] The House version of CERCLA held a party liable only if they "caused or contributed to" a release. H.R. 7020, 96th Cong., 2d Sess. § 3071(a)(1), 126 Cong.Rec. 26,779 (1980). This provision does not appear in the final version of the statute.
[11] When asked during his deposition whether it was possible to identify the source of the materials in the Frontenac tanks at the time materials were drained for spraying, Bliss responded, "No, sir, there was no way. It's just like if you cut your finger with a buzz saw  you don't know what blade got you." Bliss Deposition at 146.
[12] The above analysis may be seen in terms of burdens and presumption: If the government shows that the Verona wastes were placed in the tanks from which the spray material was drained, there arises a presumption of causation. The defendant may then overcome this presumption through the "third party" defense. See generally Developments, 99 Harv.L.Rev. 1521 n. 43.
[13] The NEPACCO defendants raise a dispute regarding the source of the Timberline stables oil. In his deposition, a Bliss employee remembers spraying Timberline after Verona waste had been placed in the Frontenac tank but stated that the oil used to spray Timberline did not come from the tank. Nevertheless, the truck used to spray Timberline had earlier carried loads from Frontenac. Given the small concentrations of hazardous substances involved, residue from the Verona waste would be sufficient to contaminate the site. In light of the above discussion of causation and the "third party" defense, the defendants have failed to raise an adequate defense to liability.