UNITED STATES of America, Plaintiff,

v.

Royal N. HARDAGE, et al., Defendants.

ADVANCE CHEMICAL COMPANY, et al., Hardage Steering Committee, Defendants and Third–Party Plaintiffs,

v.

ABCO, INC., et al., Third–Party Defendants.

No. CIV–86–1401–P.

United States District Court, W.D. Oklahoma.

Aug. 8, 1990.
As Corrected Oct. 16, 1990.

Kalyn Cherie Free, Drenaye L. Houston, Department of Justice, Charles de Saillan, John Dugdale, E.P.A., for U.S.

Jerome T. Wolf, Carl Helmstetter, Kansas City, Mo., Allan Gates, Little Rock, Ark., Jeffrey N. Martin, Washington, D.C., James C. Morriss, Stephen Fink, Dallas, Tex., Walter J. Hryszko, Houston, Tex., Michael D. Graves, Tulsa, Okl., Howard Seitzman, Austin, Tex., Charles W. Shipley, Tulsa, Okl., Amanda G. Birrell, Austin, Tex., Steve McKinney, Oklahoma City, Okl., Gavin McInnis, John D. White, Houston, Tex., Ross Plourde, Andy Coats, Leanne Burnett, Jean McLemore, Joseph F. Guida, Oklahoma City, Okl., Steve LeSatz, Houston, Tex., Irwin Steinhorn, Oklahoma City, Okl., for Hardage Steering Committee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING LIABILITY TRIAL INVOLVING USPCI

PHILLIPS, District Judge.

### I. INTRODUCTION

On April 23, 1990, the Liability Phase of this case came on for trial pursuant to this Court's January 29, 1990, scheduling order.[1] Only one defendant, United States Pollution Control, Inc. ("USPCI"), proceeded to trial. All other defendants either stipulated to liability,[2] were dismissed by the plaintiff,[3] or were the subject of dispos-

---

1. Agreed Scheduling Order for Liability Phase Trial, *United States v. Hardage*, No. CIV–86–1401–P (W.D. Okla. Jan. 29, 1990) (filing No. 2367).

2. On November 10, 1988, 24 of the primary defendants stipulated to liability under sections 106 and 107 of CERCLA, with judgment entered that date. Judgment and Order (Nov. 10, 1988) (filing No. 1553). The stipulating defendants were: AT & T Technologies, Inc.; Advance Chemical Distribution, Inc.; Allied–Signal, Inc.; Ashland Oil, Inc.; Atlantic Richfield Co.; Sam L. Bishkin, individually & dba Eltex Chemical and Supply Co.; Borg–Warner Corp.; Exxon Chemical Americas; Firestone Tire & Rubber Co.; GenCorp, Inc.; Honeywell Bull, Inc.; Magnetic Peripherals, Inc.; Maremont Corp.; McDonnell Douglas Corp.; Mobil Chemical Co.; Nalco Chemical Co.; Oklahoma Gas & Electric Co.; Oklahoma Publishing Co.; Texaco Refining and Marketing, Inc.; Texas Instruments. Inc.; UOP, Inc.; The Uniroyal Goodrich Tire Co.; Westinghouse Electric Corp.; and Weyerhaeuser Co.

Defendant L & S Bearing Co. stipulated to liability on June 1, 1989, with judgment by this Court entered on June 16, 1989. Judgment and Order (June 16, 1989) (filing No. 1799).

3. On July 11, 1986, the United States dismissed this case against defendant Unit Parts Co. Notice of Dismissal (July 11, 1986) (filing No. 31).

On April 13, 1990, the United States moved to voluntarily dismiss this case against Powell Sanitation Services, Inc., which was approved by the Court approved on April 18, 1990. *See* Plaintiffs' Motion for Voluntary Dismissal of Defendant Powell Sanitation Corp. (filed Apr.

itive motion rulings by the Court.[4]

As a part of the Final Pretrial Order filed April 20, 1990, the parties provided the following brief preliminary statement of the case. It reads:

This is the Liability Phase of this action under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 and 9607. In this Phase, Plaintiff seeks to prove that Defendant United States Pollution Control, Inc. ("USPCI") is liable under section 107(a)(4) of CERCLA. If Defendant is found liable, Plaintiff also seeks that USPCI be adjudged liable for response costs awarded the United States and for injunctive relief pursuant to Section 106(a) of CERCLA.

Final Pretrial Order at 2 (Apr. 20, 1990) (filing No. 2633).

With respect to the one defendant who proceeded to trial, USPCI and the United States stipulated to all of the essential elements for CERCLA liability except one: whether USPCI, as a transporter of hazardous waste, selected the Hardage Site for disposal of those hazardous substances.

The United States contends that USPCI selected or participated in selecting the Hardage Site for disposal of hazardous substances on at least one occasion.

USPCI argues that the United States must prove the following three elements in order to impose liability: (1) the material in a USPCI shipment actually went to the Hardage Site, (2) the material shipped was hazardous material, and (3) USPCI selected the site. USPCI contends that it was a highly regulated, permitted common carrier that merely suggested the Hardage Site as a disposal site. USPCI further contends that Congress intended to limit liability under the act to transporters who select disposal sites, not to make transporters liable

who merely make proposals to customers regarding possible disposal sites.

For the reasons set forth in this Order, the Court finds USPCI liable under sections 106(a) and 107(a)(4) of CERCLA. Specifically, the Court finds that USPCI selected the Hardage Site on at least one occasion for the disposal of hazardous substances.

## II. STIPULATIONS

In the Final Pretrial Order filed on April 20, 1990, the parties entered the following stipulations:

A. All parties are properly before the court;

B. The court has jurisdiction of the parties and of the subject matter;

C. All parties have been correctly designated;

D. Facts:

1. Defendant Royal N. Hardage is the owner and former operator of the site.

2. Other stipulated facts are set forth in the Joint Statement of Uncontested Facts filed April 10, 1990.

E. United States' Factual/Legal Issue

1. Did USPCI select the Hardage site on at least one occasion for the disposal of hazardous substances or participate in the site selection process, thus making USPCI liable under §§ 106 and 107 of CERCLA?

F. USPCI's Factual/Legal Issues

1. What constitutes "site selection" under Section 104(a)(4) of CERCLA?

2. What is the Plaintiff's burden and standard of proof in determining transporter liability under CERCLA?

3. What is the weight and sufficiency of evidence required to support a finding of transporter liability under CERCLA?

13, 1990) (filing No. 2569); Order (Apr. 18, 1990) (filing No. 2603).

**4.** *See* Order Granting in Part and Denying in Part Plaintiff's Motion for Partial Summary Judgment on Liability Under CERCLA Sections 106 and 107 (May 23, 1990) (filing No. 2806). Summary judgment was granted against Cato Oil & Grease Co., Dal–Worth Industries, Inc., Double Eagle Refining Co., JOC Oil Exploration

Co., Inc., Oklahoma National Stock Yards Co., and Rockwell International Corp. on June 11, 1990. Judgment (June 11, 1990) (filing No. 3012).

*See* Order Granting Plaintiff's Motion for Summary Judgment on Liability Against Kerr–McGee Corp. and Kerr–McGee Refining Corp. (May 29, 1990) (filing No. 2846).

4. Whether the materials transported to the Hardage site by USPCI for certain generator customers were hazardous substances.

5. Whether USPCI selected the Hardage Disposal Site within the meaning of CERCLA 107(a)(4) when transporting hazardous substances on behalf of customers identified by Plaintiffs.

Final Pretrial Order at 2–3.

## III.  UNCONTESTED FACTUAL FINDINGS

On April 10, 1990, the United States and USPCI filed a joint statement of uncontested facts.  The Court adopts these uncontested facts as part of its findings and conclusions:[5]

1. The President, through his delegated authority, has determined that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from the Hardage site.

2. Release of hazardous substances like some of those transported by USPCI have occurred at the Hardage site.

3. USPCI transported hazardous substances for certain customers to the Hardage site where they were disposed.

4. The United States has incurred response costs in connection with the release or threatened release of hazardous substances at the Hardage site pursuant to CERCLA § 107(a)(4)(A).

5. The Royal N. Hardage industrial waste site (the site) is located in McClain County, Oklahoma, approximately 15 miles southwest of Norman, Oklahoma and ½ mile west of the Community of Criner, Oklahoma.

6. The site is located on the 160–acre quarter section 2 in the southwest corner of Section 24, T6N, R4W.

7. The site is bounded on the south by State Highway 22, a gravel road on the west, on the east by three small farm ponds, and on the north by the northwest quarter of Section 24, and it was within this general area that hazardous waste operations were conducted by Royal N. Hardage between 1972 and 1980.

8. The site constitutes a facility within the meaning of 42 U.S.C. § 9601(9).

9. On September 15, 1972, based upon Hardage's application, Loyd F. Pummill, State Sanitary Engineer and R. Leroy Carpenter, M.D., State Commissioner of Health, Oklahoma State Department of Health granted Royal N. Hardage a permit to construct, operate and maintain and [sic] Industrial Waste Disposal facility located approximately three quarters of a mile west of Criner, Oklahoma in SW¼, SW¼, and S½, NW¼, SW¼, Section 24, T6N, R4W, McClain County, Oklahoma, under Permit No. 3544005.

10. On approximately October 2, 1972, shortly after receiving an operation permit from the Oklahoma State Department of Health, Royal N. Hardage opened his hazardous waste disposal site and began receiving waste.

11. The Hardage Site was open for the receipt of waste from October, 1972 through November, 1980 except for a period from February through August, 1976. The site also may have been closed for short periods at other times.  Until June 1979, the Hardage site was the only permitted industrial waste landfill in the State of Oklahoma.

12. Mr. Hardage received and accepted waste at the site from at least 385 known customers.  Mr. Hardage determined the manner by which these solid wastes, hazardous wastes, and hazardous substances were treated, stored, and/or disposed of at the Hardage site.

13. Beginning in 1972, Mr. Hardage maintained a ledger showing the generator, transporter, description, volume, and after

---

**5.** Some of these stipulations have been rendered moot as a result of the Court's trial rulings striking government allegations concerning USPCI customers other than Weyerhaeuser Co., Honeywell Corp., Magnetic Peripherals, Inc., and McDonnell Douglas Corp.  The reasons for these rulings appear in the trial transcripts.  As a result, while some of the stipulations pertain to customers other than these four, the Court's additional factual findings on the remaining contested matters focus only on these four customers.

1976, the ticket number for most wastes disposed of at the site. Beginning in 1976, shipping manifests were used to record the shipment of waste to the Hardage site.

14. Approximately 20 million gallons of hazardous substances were transported to, treated at, stored at and/or disposed of at the Hardage site.

15. At all times during which the United States alleges that Defendant USPCI transported hazardous substances to the Hardage Site, the Hardage Site was permitted to Royal N. Hardage by the Health Department of the State of Oklahoma for operation as a landfill disposal site for controlled industrial wastes.

16. The Hardage Site was the only landfill disposal site for controlled industrial wastes in the State of Oklahoma that was approved and permitted by the Health Department of the State of Oklahoma between October 1972 and May 1979.

17. On October 3, 1973, USPCI and Royal N. Hardage entered into an agreement regarding shipment and acceptance of wastes and rates for the Hardage site.

18. USPCI began transporting waste materials to the Hardage site for disposal in October 1972.

19. Groendyke Transport, Inc., was a subcontractor of USPCI in transporting approximately 32 shipments to the Hardage site.[6]

20. Richard Herndon was a Groendyke driver on some of the shipments when Groendyke Transport, Inc., was a subcontractor of USPCI.

21. Sometimes when Richard Herndon drove Groendyke trucks as a subcontractor of USPCI, he filled out portions of the USPCI bill of lading.

22. By letter of October 24, 1972, USPCI requested the Oklahoma Water Resources Board to amend USPCI's Waste Disposal Permit No. IW–71–225 to allow USPCI to dispose of waste solids, sludges and other noninjectable (Deep Well) materials at the Hardage site.

23. On January 24, 1973, the Oklahoma Waster Resources Board assigned number CW–73–004 to USPCI's waste disposal permit application.

24. USPCI obtained, held and kept current the following permits and licenses in the State of Oklahoma:

a. On June 19, 1970, the Corporation Commission of the State of Oklahoma granted the application of USPCI for authority to operate as a common carrier by motor carrier, irregular route, freight, intrastate. The findings of the Commission included, *inter alia*:

6. That the public convenience and necessity does require the granting of the application and the motor carrier authority sought by applicant; and that the granting of this authority will be in the best interest and will not be unduly detrimental to existing motor carriers (Intrastate Motor Carrier License No. 27491).

b. On June 24, 1970 the Oklahoma Corporation Commission issued USPCI the authority to transport non-petroleum deleterious waste substances between all points within the State of Oklahoma (Transporters Deleterious Substance Disposal License No. 167).

c. On November 9, 1971 the Oklahoma Water Resources Board issued a permit to United States Pollution Control, Inc. to operate a disposal well in Tulsa County, known as the Turkey Mountain Well (Disposal Well Permit No. 1W–71–088.)

d. On January 11, 1977, the Oklahoma Water Resource [sic] Board issued an operating permit to United States Pollution Control, Inc. for a disposal well in Kingfisher County, known as the Berkenbile Well (Disposal Well Permit No. 1W–71–225.)

e. On April 10, 1973, the Oklahoma Water Resource [sic] Board issued to U.S. Pollution Control, Inc., a written permit to "haul industrial solid sludge

---

6. Groendyke Transport, a defendant in Phase III of this litigation, objects to this stipulation classifying it as a subcontractor of USPCI. This stipulation, however, was entered into between the United States and USPCI for purposes of Phase II litigation only, and the Court accepts the stipulation with this limitation.

waste from industries to Oklahoma Water Resource [sic] Board approved industrial hazardous waste land disposal site in McClain County (the Hardage Site) (Water Resources Board Permit No. CW–73–004).

25. USPCI provided some potential customers with a listing of its permits and licenses, which included USPCI's permit to haul for disposal at the Hardage Site.

26. USPCI was aware of relevant laws and regulations in the State of Oklahoma regarding the transportation of hazardous waste materials.

27. Upon enactment of the Oklahoma Controlled Industrial Waste Disposal Act in 1976 (presently codified at 63 O.S. §§ 1–2001, *et seq.*), all hazardous waste shipments off site were required to be accompanied by a manifest.

28. A common carrier's responsibility in providing common carrier service is to move a shipment from the shipper to receiver.

29. USPCI was not itself able to transport as a common carrier materials out of the State of Oklahoma until 1981 when it received operating authority as an interstate common carrier from the Interstate Commerce Commission.

30. Instructions on the Oklahoma Manifest required the generator to designate the disposal location on the manifest. However, certain generators did not always fill in the line of the manifest captioned "Destination: Waste Receiving Site".

31. USPCI never operated or owned or had any ownership interest in the Hardage Site.

32. USPCI transported hazardous substances to the Hardage site for disposal on behalf of McDonnell–Douglas Corporation.

33. USPCI transported hazardous substances to the Hardage site for disposal on behalf of Weyerhaeuser Company.

34. USPCI transported hazardous substances to the Hardage Site for disposal on behalf of Honeywell, Inc.

35. A contract dated August 16, 1972, was signed by Wesley Smith for USPCI and a representative of McDonnell–Douglas Corporation.

36. Initially under the contract, USPCI transported some McDonnell–Douglas wastes to USPCI-owned disposal facilities.

37. USPCI began providing waste disposal service for Honeywell in 1969.

38. When ownership of the Honeywell facility transferred to Magnetic Peripherals, Wesley Smith entered into a new agreement with Magnetic Peripherals. However, the previous transportation services and disposal locations in effect with Honeywell were continued.

39. A Purchase Order dated October 15, 1975 was issued by Weyerhaeuser for USPCI's hauling services.

40. Honeywell, Magnetic Peripherals, McDonnell–Douglas and Weyerhaeuser each wanted their waste products, including hazardous substances generated by them, transported in accordance with existing laws and disposed at facilities authorized to receive such waste.

41. Honeywell, Magnetic Peripherals, McDonnell–Douglas and Weyerhaeuser were concerned that transportation and disposal were legal.

42. Honeywell, Magnetic Peripherals, McDonnell–Douglas and Weyerhaeuser each, at varying times, became aware that the Hardage Site was the only permitted landfill facility in Oklahoma for the disposal of controlled industrial wastes prior to June of 1979.

43. On January 14, 1975, Wes Smith and Howard Meck, Weyerhaeuser Superintendent, met at the Wright City plant to discuss Weyerhaeuser's waste materials and USPCI's services. The next day, Wes Smith sent a letter to Howard Meck confirming their conversations.

44. USPCI entered into an agreement with Noble Chemical Company whereby Noble could transport to the Hardage site under USPCI's permit number.

45. USPCI entered into an agreement with Dal–Worth Industries whereby Dal–Worth could transport to the Hardage site under USPCI's permit number.

46. USPCI transported waste materials to the Hardage site for disposal on behalf of Texas Instruments.

47. USPCI transported hazardous substances to the Hardage site for disposal on behalf of ARCO Chemical Company.

United States' and USPCI's Joint Statement of Uncontested Facts at 1–6 (Apr. 10, 1990) (filing No. 2538).

## IV. WITNESSES

The United States' evidentiary presentation included four officers, employees, and former employees of companies for which USPCI transported hazardous waste. The witnesses and companies included: Calvin Brusewitz and Sarah Kline, McDonnell Douglas Corp.; Howard Meck, Weyerhaeuser Corp.; and Michael Miruski, Honeywell/Magnetic Peripherals, Inc. In addition, Donald Lee Kirkham of Dal–Worth Industries, Inc., Dr. Eugene Meyer, an expert witness, and Weldon Copeland of the Oklahoma Corporation Commission, testified on behalf of the United States.

USPCI presented the following witnesses in defense: Wesley Smith, former vice president and general manager of USPCI; Donald Hensch, a USPCI employee and a former OSDH employee; Harry A. Hansen, former environmental manager and president of USPCI; and Clifford J. Harvison, president of National Tank Truck Carriers, the trade association for common carriers.

## V. EXHIBITS

The United States introduced the following exhibits at the trial: Government Exhibit Nos. 1–11, 13–17, 19–23, 25, 27–28, 30–47, 50, 50a–c, 51, 53–54, 56, 58–73, 75–79, 81–84, 87–90, 94–96, 98, 98a, 101–03, 105–09, 111–20, 122, 125, 127–28, 130, 133, 137b–c, 137e–k, and 139.

The Court accepted the following USPCI exhibits: Defense Exhibit Nos. 1–197.

## VI. ADDITIONAL FACTUAL FINDINGS

### A. General [7]

1. On or about October 3, 1972, USPCI and Mr. Hardage signed a contract in which Mr. Hardage agreed to "accept the hazardous waste delivered by" USPCI, and USPCI agreed to "send all their hazardous waste to the [Hardage] site ..., except those waste materials that can be injected into USPCI disposal wells." GE 94. USPCI, through its senior management, thus selected the Hardage Site for disposal of hazardous substances long before it approached the customers described below.

2. The October 3, 1972, contract between USPCI and Mr. Hardage did not provide a termination date.

3. By letter of October 24, 1972, USPCI asked the Oklahoma Water Resources Board to amend USPCI's Waste Disposal Permit No. IW–71–225 to allow USPCI to dispose of waste solids, sludges, and other non-injectable (deep well) materials at the Hardage Site. USPCI received oral permission to transport to the Hardage Site at that time and received a formal written permit in early 1973.

4. At various times during the USPCI–Hardage relationship there were licensed injection wells operating in Oklahoma, including one known as the Turkey Mountain facility, which was operated by USPCI. Only certain liquids could be injected into licensed disposal wells, making the Hardage Site the only available disposal site in Oklahoma for heavy sludges and solid hazardous wastes.

5. On January 23, 1973, USPCI filed a waste disposal permit application with the Oklahoma Water Resources Board for the disposal of hazardous waste at the Hardage Site.

---

7. Unlike the Remedy Phase trial, which spanned November and December 1989, involved lengthy expert testimony, a 2,500 page transcript, and thousands of pages of exhibits, the Liability Phase trial was relatively brief. As a result, the Court's findings reflect the Court's view of the preponderance of the evidence based on the entire record, and no attempt has been made (as was done for the Remedy Phase order) to cite specific transcript pages in support of the Court's factual findings. Certain exhibit references, however, have been made in these findings. These references are not intended to reflect the only authority in support of the proposition in question. Instead, the Court has relied on the record as a whole, including all testimony given during both direct and cross-examination, affidavits, and exhibits.

6. Although it never had an ownership interest in the Hardage Site, USPCI held itself out to a government witness, Mr. Kirkham, as owner/operator of the Hardage Site.

7. The Oklahoma Controlled Industrial Waste Disposal Act, which became effective in late 1976, requires the use of hazardous waste disposal manifests.

8. The instructions on the hazardous waste manifest form required the generator/shipper to designate the disposal site for the waste prior to transporting the waste.

9. Certain generators did not fill in the line of the manifest captioned "Destination: Waste Receiving Site."

10. USPCI witnesses acknowledged that USPCI transported hazardous substances to the Hardage Site, listing itself on pertinent shipping documentation as the "Generator/Shipper."

11. USPCI selected the Hardage Site for the disposal of hazardous substances on at least one occasion.

12. USPCI is jointly and severally liable for implementation of the remedy at the Hardage Site and for reimbursement of response costs incurred by the United States.

B. *Weyerhaeuser*

1. USPCI accepted from Weyerhaeuser hazardous substances for transport for treatment or disposal. Weyerhaeuser hired USPCI to give Weyerhaeuser turnkey service, or complete disposal service.

2. USPCI transported hazardous substances accepted from Weyerhaeuser to the Hardage Site.

3. USPCI began transporting various industrial wastes from Weyerhaeuser's Wright City plant in 1975. GE 14.

4. USPCI selected the Hardage Site as the disposal site for the hazardous substances it accepted from Weyerhaeuser and transported to the Hardage Site.

5. The Purchase Orders issued by Weyerhaeuser for USPCI's services generally did not specify a disposal site.

6. Howard Meck, plant manager at Weyerhaeuser's Wright City plant, was the sole contact for USPCI. GE 14.

7. Mr. Meck was the plywood plant manager at Weyerhaeuser's facility located in Wright City from approximately July 1971 until April 1978.

8. USPCI proposed the Hardage Site to Weyerhaeuser as the disposal site for disposition of certain Weyerhaeuser wastes prior to any transportation by USPCI of Weyerhaeuser's wastes. GE 13.

9. Weyerhaeuser did not instruct USPCI to transport its hazardous waste to the Hardage Site.

10. USPCI disposed of Weyerhaeuser's waste pursuant to a letter dated January 15, 1975, and a purchase order dated October 15, 1975. GE 13 & 14.

11. Mr. Wesley Smith, a vice president of USPCI, visited Mr. Meck at the Weyerhaeuser plant in Oklahoma City, viewed the waste pit, and discussed disposal options as well as USPCI's services prior to preparing his January 15, 1975, letter to Mr. Meck.

12. On or about October 1, 10, 27, or 31, 1975, Groendyke Transport, Inc., transported shipments of 6,000 gallons each of caustic sludge from Weyerhaeuser's Wright City plant to the Hardage Site. GE 35.

13. Examples of hazardous wastes and substances disposed of at the Hardage Site by USPCI on behalf of customer Weyerhaeuser Co. include formaldehyde, sodium hydroxide, and phenolic resin wastes containing phenol. Other wastes were also transported. *See, e.g.,* GE 40, 111–14, 133 & 137c. *See* 40 C.F.R. § 302.4 & Table 302.4 (1989), for a list of designated hazardous substances.

14. All of the shipping tickets pertaining to Weyerhaeuser bore the required signature of Weyerhaeuser personnel and contained the reference "Hardage OK." This does not indicate, as USPCI suggested, that Weyerhaeuser selected the Hardage Site for disposal of Weyerhaeuser's waste. These shipping tickets were signed long after the site selection decision had been made.

15. The Court found Mr. Meck to be a credible witness. Given the passage of time, his lack of recollection on certain matters was understandable. Similarly, the Court found Dr. Meyer to be a credible and qualified expert in his field. The Court further finds that the information relied upon by Dr. Meyer was the type of information reasonably relied upon by experts in Dr. Meyer's field.

16. The government proved by a preponderance of the evidence that USPCI selected the Hardage Site for shipment of the Weyerhaeuser wastes.

C. *Honeywell/Magnetic Peripherals*

1. USPCI accepted from Honeywell hazardous substances for transportation for treatment or disposal.

2. USPCI transported hazardous substances accepted from Honeywell to the Hardage Site. USPCI sent hazardous substances accepted from Honeywell to the Hardage Site without Honeywell's knowledge.

3. USPCI selected the Hardage Site as the disposal site for the hazardous substances it accepted from Honeywell and transported to the Hardage Site.

4. USPCI began transporting waste from Honeywell's Oklahoma City facility in approximately 1969.

5. Michael Miruski was the employee of Honeywell, and later of Magnetic Peripherals, Inc., who acted as the primary contact with USPCI.

6. In approximately 1971 or 1972, Mr. Smith of USPCI visited the Honeywell facility and offered to dispose of Honeywell's industrial waste.

7. On March 1, 1973, USPCI sent a letter to Honeywell that included a proposal for the transport and disposal of Honeywell's industrial wastes at specified rates. GE 44. Honeywell accepted this proposal.

8. Mr. Smith wrote detailed proposal letters to Honeywell that specifically mentioned charges for various types of waste and the disposal locations proposed for each kind of waste. GE 19–21, 44 & 76.

9. Honeywell was not aware that USPCI was transporting its waste to the Hardage Site until sometime in 1973, when Mr. Miruski directed another Honeywell employee to follow a USPCI truck hauling Honeywell waste to see where the waste was being taken.

10. Honeywell did not instruct USPCI to transport its waste to the Hardage Site during the period from 1972 to 1975.

11. Examples of hazardous wastes disposed of at the Hardage Site by USPCI on behalf of customer Honeywell Corp., include oils, solvents, solvent sludge, stripper, and zinc chloride. The solvents used by Honeywell were trichlorathane and freon, which are hazardous substances. *See, e.g.,* GE 115, 116, 117, 119 & 125. *See* 40 C.F.R. § 302.4 & Table 302.4 (1989).

12. Effective August 1, 1975, the name of Honeywell was changed to Magnetic Peripherals, Inc. DE 132. USPCI had been transporting waste materials for Honeywell prior to the name change and continued to transport waste materials for Magnetic Peripherals under the same arrangements made previously with Honeywell.

13. Magnetic Peripherals requested a renewal of the contract and USPCI submitted a proposal dated December 23, 1975, that quoted rates for disposal of solid waste materials at the Hardage Site. GE 21.

14. USPCI accepted from Magnetic Peripherals, Inc., hazardous substances for transport for treatment or disposal.

15. USPCI transported to the Hardage Site hazardous substances accepted from Magnetic Peripherals, Inc.

16. USPCI selected the Hardage Site as the disposal site for the hazardous substances it accepted from Magnetic Peripherals, Inc., and transported to the Hardage Site.

17. Examples of hazardous wastes disposed of at the Hardage Site by USPCI on behalf of customer Magnetic Peripherals, Inc., included paint sludge. The sludge contained various hazardous substances, including copper, lead, nickel, and zinc. *See, e.g.,* GE 40, 43 & 118. *See* 40 C.F.R. § 302.4 & Table 302.4 (1989).

18. Although Magnetic Peripherals filled out shipping manifests that indicated that its wastes should be shipped to the Hardage Site (DE 148 & 152), USPCI incorrectly asserts that Magnetic Peripherals necessarily selected the site. The site selection decision had already been made by the time these documents were filled out.

19. The government proved by a preponderance of the evidence that USPCI selected the Hardage Site for the shipment of Honeywell/Magnetic Peripherals wastes.

20. The Court finds Mr. Miruski to be a credible witness.

### D. *McDonnell Douglas*

1. USPCI began transporting various industrial wastes from the McDonnell Douglas plant in Tulsa in approximately 1972. GE 50a.

2. On or about August 16, 1972, USPCI and McDonnell Douglas signed a contract for the disposal of McDonnell Douglas wastes. GE 50a.

3. The contract between McDonnell Douglas and USPCI for the disposal of McDonnell Douglas waste did not specify a disposal site. GE 50a.

4. The contract between McDonnell Douglas and USPCI specifically provided that "[n]o other services, for which there will be a charge, are to be provided by U.S. Pollution Control, Inc., without Douglas Aircraft Company's prior knowledge and consent." GE 50a Attachment A. The contract further provides that "[t]his Contract is placed with the understanding that the Vendor has all necessary permits required for the hauling and disposing of hazardous material." *Id.*

5. As a government contractor for the United States Air Force, McDonnell Douglas operated under highly structured contracting procedures.

6. Paul Senior was the senior buyer at McDonnell Douglas who acted as the primary contact with USPCI until November 1974.

7. Sarah Kline was the employee of McDonnell Douglas who took over for Paul Senior and who acted as the primary contact with USPCI after November 1974.

8. After Thanksgiving in 1974, Ms. Sarah Kline became involved with the USPCI contract. Mr. Senior had suffered a stroke in late 1974 immediately before Ms. Kline took over the responsibility for the USPCI contract.

9. Calvin Brusewitz was another employee of McDonnell Douglas who was involved in discussions with USPCI.

10. In 1975 and in subsequent years Ms. Kline negotiated amendments to the original contract between USPCI and McDonnell Douglas. The amendments related primarily to changes in the rates for the services provided by USPCI.

11. On at least one occasion McDonnell Douglas sought quotes to transport its wastes to a site in Kansas, but determined that transport to the out-of-state location would result in higher rates and continued using USPCI to transport its wastes to the Hardage Site.

12. USPCI accepted from McDonnell Douglas hazardous substances for transport and treatment or disposal.

13. USPCI transported hazardous substances accepted from McDonnell Douglas to the Hardage Site.

14. USPCI selected the Hardage Site as the disposal site for hazardous substances it accepted from McDonnell Douglas and transported to the Hardage Site.

15. Examples of hazardous wastes disposed of at the Hardage Site by USPCI on behalf of customer McDonnell Douglas Corp. include: phenol, formic acid, methylene chloride, and Turco products. *See, e.g.,* GE 40, 50c, 96, 120, 122, 128, 130 & 133. The Turco product referenced above contained sodium hydroxide, a hazardous substance. 40 C.F.R. 302.4 & Table 302.4 (1989).

16. Although the contract between McDonnell Douglas and USPCI for the disposal of McDonnell Douglas wastes was amended several times between 1972 and 1980, none of these amendments specified a disposal site.

17. The purchase orders issued by McDonnell Douglas for USPCI's services did not specify a disposal site.

18. Ms. Kline had numerous communications, both oral and written, with various USPCI personnel regarding the Hardage Site. Many of these oral conversations are evidenced either by confirmation letters from USPCI personnel or by handwritten memoranda prepared by Ms. Kline.

19. At trial, Ms. Kline testified that she had no current recollection of most of her conversations regarding the Hardage Site.

20. Although Ms. Kline's testimony was weak, and while McDonnell Douglas represents the weakest of the customer presentations by the government, the contradictory evidence presented by USPCI was subject to severe impeachment as discussed below.

21. The Court finds government witnesses Dr. Meyer and Mr. Brusewitz to be credible witnesses. Relying primarily upon the documentary evidence, as well as the testimony of Dr. Meyer and Mr. Brusewitz, the Court finds that the government met its burden of proving by a preponderance of the evidence that USPCI selected the Hardage Site for the disposal of McDonnell Douglas wastes.

E. *Common Carrier Issue*

1. Pursuant to title 47, section 163 of the Oklahoma Statutes, on or about April 17, 1970, USPCI filed with the Oklahoma Corporation Commission a tariff setting forth and publishing its rates, fares, and charges for transport as a common carrier.

2. USPCI did not file an amendment or revision to the tariff until about February 1982. USPCI was not itself able to transport as a common carrier materials out of the State of Oklahoma until 1981, when it received operating authority as an interstate common carrier from the Interstate Commerce Commission.

3. The rates, fares, and charges that USPCI charged Honeywell for the transport of wastes to the Hardage Site exceed the rates, fares, and charges set forth in the 1970 tariff.

4. USPCI acted as a contract carrier, rather than as a common carrier, for the wastes it accepted from Honeywell and transported to the Hardage Site.

5. The rates, fares, and charges that USPCI charged Magnetic Peripherals, Inc., for the transport of wastes to the Hardage Site exceeded the rates, fares, and charges set forth in the 1970 tariff.

6. USPCI acted as a contract carrier, rather than as a common carrier, for the wastes it accepted from Magnetic Peripherals, Inc., and transported to the Hardage Site.

7. The rates, fares, and charges that USPCI charged Weyerhaeuser for the transport of wastes to the Hardage Site exceeded the rates, fares, and charges set forth in the 1970 tariff.

8. USPCI acted as a contract carrier, rather than as a common carrier, for the wastes it accepted from Weyerhaeuser and transported to the Hardage Site.

9. The rates, fares, and charges that USPCI charged McDonnell Douglas for the transport of waste to the Hardage Site exceeded the rates, fares, and charges set forth in the 1970 tariff.

10. USPCI acted as a contract carrier, rather than as a common carrier, for the wastes it accepted from McDonnell Douglas and transported to the Hardage Site.

11. The custom and practice of USPCI was not consistent with the custom and practice of a common carrier.

12. USPCI did not act as a common carrier for the wastes it accepted from the above referenced customer and transported to the Hardage Site.

13. USPCI did not act as a common carrier when it selected the Hardage Site for the disposal of wastes accepted from its customers.

F. *Miscellaneous Findings of Fact*

1. Wesley Smith, the former vice president and general manager of USPCI, was a key witness for USPCI. The Court finds that he has a substantial interest in the outcome of the liability phase of this case, that his testimony was contradicted by credible government witnesses including Mr. Kirkham and Mr. Miruski, and others, and that his credibility was impaired on cross-examination.

2. Mr. Smith's practice was to advise USPCI customers of disposal options. According to Mr. Smith, most customers did not want wastes to go to the Hardage Site if the wastes could be placed in USPCI's injection well. USPCI's preference with respect to liquids was to dispose of the waste in USPCI's injection well, although the Hardage Site was the only permitted hazardous waste landfill in Oklahoma suitable for thick or solid materials.

3. Mr. Smith proposed disposal options to Honeywell, McDonnell Douglas, and Weyerhaeuser. With respect to the McDonnell Douglas contract, Mr. Smith made substantial efforts to win that contract. Mr. Smith's claim that he did not propose the Hardage Site to McDonnell Douglas is contradicted by other evidence.

4. USPCI had an interest in disposing of waste at the least expensive site available. USPCI made the determination as to whether the Hardage Site was the least expensive available disposal site. Even in those instances in which USPCI permitted or received customer input in the site selection process, the Court finds that USPCI selected the site to which it transported the hazardous wastes in question.

5. Generally, rates to dispose of waste material at the Hardage Site were several times higher than rates at other Oklahoma disposal facilities, such as USPCI's licensed injection well.

6. The Court, after carefully observing the demeanor of the witnesses and viewing the record as a whole, cannot rely on the testimony of Mr. Smith as an objective portrayal of USPCI's involvement in site selection. As further support for this adverse credibility finding, the Court finds:

(a) Mr. Smith inaccurately represented to government witness Kirkham that USPCI had an ownership interest in the Hardage Site.

(b) Mr. Smith testified on cross-examination that he did not assist any generators in making a determination as to where their waste would be disposed. This answer was thoroughly impeached by the testimony of other witnesses, documentary evidence, and Mr. Smith's prior testimony.

(c) During Mr. Smith's August 20, 1987, deposition, he was asked the following questions and he gave the following answers:

Q. Do you remember, if you do, any instances where a company did not express a preference as to where they wanted their waste taken?

A. They looked to USPCI as a reputable company to dispose of their waste properly. *And so, they looked to us to make a decision as to where it was going to be going. And we did it based on the quality—well, the type waste it was, the quantity, the solid contents, you know, chemistry, all of these factors determined in our mind where that waste stream would go.* And oftentimes, it would be a mixed package. Some of the waste may go to Tulsa; some of the waste may go to Hardage. So for that reason, it was brought back to Tulsa and total loads for Hardage would be combined and sent to Hardage.

Smith Deposition at 143 (emphasis added).

Q. And who or what predetermined it?

A. By prior conversations either, generally, it was face to face with a representative of the generator. Very rarely would we ever pick up anything until I would go back and examine the material, pick up a sample, and determine where it was going, get analysis from them and determine what the material was going to be in order to determine where the ultimate disposal site would be.

*Id.* at 144.

Q. So it was up to these smaller companies—the ones you referred to particularly were plating companies as an example—they looked to you all to make determination (sic) as to where to take the waste so long as it was proper?

A. Yes, so long as it was proper. And it was available to the public; and it was determined primarily by economics.

*Id.* at 137.

7. USPCI's claim that it was not involved in site selection for waste shipments is impeached by documentary evidence. For example, according to Government Exhibit No. 153, on or about May 5, 1979, USPCI shipped 1,500 gallons of corrosive acid to the Hardage Site. The document indicates that USPCI selected the site for this waste shipment. Moreover, the former president of USPCI, Harry Hansen, acknowledged in his testimony that USPCI selected the Hardage Site for this shipment.

8. Any finding of fact contained in this Order that should more properly be considered as a conclusion of law shall be deemed a conclusion of law for purposes of this Order. Any conclusion of law contained in this Order that should more properly be considered a finding of fact shall be deemed a finding of fact for purposes of this Order.

## VII. LEGAL DISCUSSION

A. *Statutory Provisions and Elements of CERCLA Liability*

In 1980, Congress enacted CERCLA "as a comprehensive response to the problems of hazardous waste," *United States v. Bliss*, 667 F.Supp. 1298, 1304 (E.D. Mo. 1987), and to provide "an array of mechanisms to combat the increasingly serious problem of hazardous substance releases." *United States v. Monsanto Co.*, 858 F.2d 160, 167 (4th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989) (quoting *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1078 (1st Cir.1986)). Through CERCLA, Congress intended to provide the federal government with tools for "prompt and effective response to hazardous waste problems and to force those responsible for creating hazardous waste problems to bear the cost of their actions." *Bliss*, 667 F.Supp. at 1304. In addition, Congress authorized the government to respond to releases or threatened releases of hazardous substances into the environment and to recover cleanup and response costs. 42 U.S.C. §§ 9604(a) & 9607 (1982 & Supp. V 1987). Also, in enacting CERCLA Congress "authorized federal district courts to grant injunctive relief to protect public health and to facilitate clean-up activities." *Bliss*, 667 F.Supp. at 1304; 42 U.S.C. § 9606 (1982 & Supp. V 1987).

Section 107(a) of CERCLA provides, in pertinent part:

(a) . . .

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a . . . facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility . . . owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities . . . or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State . . . not inconsistent with the national contingency plan;

. . . .

42 U.S.C. § 9607(a) (Supp. V 1987).

The language of this section "clearly defines the scope of intended liability under the statute and the elements of proof necessary to establish it." *Monsanto*, 858 F.2d at 167. Certain of the requisite elements of a prima facie case under section 107(a) relate to the site in general, while others relate to the individual defendants.

With respect to the Hardage Site, the United States must establish:

(1) the Hardage Site is a "facility." *Amoco Oil Co. v. Borden*, 889 F.2d 664, 668 (5th Cir.1989); *United States v. Aceto Agricultural Chems. Corp.*, 872 F.2d 1373, 1379 (8th Cir.1989).

(2) a "release or a threatened release" of a "hazardous substance" from the Hardage Site has occurred or is occurring. *Amoco Oil*, 889 F.2d at 668; *Aceto Agricultural Chems.*, 872 F.2d at 1379.

(3) the release or a threatened release has caused the United States to incur response costs. *Amoco Oil*, 889 F.2d at 668; *Aceto Agricultural Chems.*, 872 F.2d at 1379.

In addition, to complete a prima facie case against a defendant, the United States must prove:

(4) a defendant falls within one of the classes of liable persons described in section 9607. *Amoco Oil*, 889 F.2d at 668; *Aceto Agricultural Chems.*, 872 F.2d at 1379.

If the United States proves each element by a preponderance of the evidence and if the defendant is unable to establish one of the defenses listed in the act,[8] or some other applicable defense, the United States is entitled to judgment on the liability issue. *Amoco Oil*, 889 F.2d at 668.

CERCLA imposes strict liability; a party's fault or state of mind is not a factor. *Monsanto*, 858 F.2d at 167–68; *Bliss*, 667 F.Supp. at 1304. This Court has already found that CERCLA imposes joint and several liability on the defendants in this case. Order Denying Motion for Summary Judgment of Cato Oil and Grease Co. (Nov. 28, 1989) (filing No. 2256) [hereinafter Order of Nov. 28, 1989]. If the harm is indivisible, as at the Hardage Site, each defendant is jointly and severally liable for the entire harm, unless the defendant can prove that the harm is divisible and that there is a reasonable basis for apportioning it. Order

of Nov. 28, 1989, at 9; *Monsanto*, 858 F.2d at 171–73.

Section 106(a) provides no independent basis for liability. Therefore, to be entitled to relief under section 106, the United States must prove liability under section 107. *United States v. Conservation Chem. Co.*, 619 F.Supp. 162 (W.D. Mo. 1985). However, once section 107 liability is established, responsible defendants are also liable for injunctive relief under section 106 where the United States proves "there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance" from a site. 42 U.S.C. § 9606(a) (1982); *United States v. A & F Materials Co.*, 578 F.Supp. 1249, 1257 (S.D. Ill.1984).

#### B. *Establishment of Site–Specific Elements*

As discussed previously in this Order, the Court noted that in order to establish liability under section 107(a) of CERCLA the United States must first establish the following elements that relate to the Hardage Site: (1) the Hardage Site is a "facility," (2) there has been a "release, or a threatened release ... of a hazardous substance" from the Hardage Site, and (3) the United States has incurred "response" costs in responding to that release or threatened release. 42 U.S.C. § 9607(a) (Supp. V 1987). In addition, in order to establish liability under section 106 of CERCLA, the United States must prove that because of the release or threatened release, "there may be an imminent and substantial endangerment to the public health or welfare or the environment." 42 U.S.C. § 9606(a) (1982).

On April 10, 1990, the United States and USPCI filed a joint statement of uncontested facts. Contained within the joint statement were uncontested facts that establish

---

**8.** Section 9607(b) states, in part:

There shall be no liability under ... this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a haz-

ardous substance and the damages resulting therefrom were caused solely by—
    (1) an act of God;
    (2) an act of war;
    (3) an act or omission of a third party....
42 U.S.C. § 9607(b) (1982).

the site-specific elements for the Hardage Site. First, the parties agreed that the Hardage Site constitutes a facility within the meaning of 42 U.S.C. § 9601(9). United States' and USPCI's Joint Statement of Uncontested Facts, para. 8 (Apr. 10, 1990) (filing No. 2538). Next, the parties agreed that "[r]elease of hazardous substances like some of those transported by USPCI have occurred at the Hardage site." *Id.* para. 2. The parties also agreed that the United States "has incurred response costs in connection with the release or threatened release of hazardous substances at the Hardage site pursuant to CERCLA § 107(a)(4)(A)." *Id.* para. 4. Finally, as to the provisions of section 106, the parties agreed:

> The President, through his delegated authority, has determined that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from the Hardage site.

*Id.* para. 1.

Based upon these agreements of the parties, the Court finds that the United States has proved by a preponderance of the evidence the site-specific elements for liability under CERCLA sections 106 and 107. 42 U.S.C. §§ 9606 & 9607 (1982 & Supp. V 1987). This leaves but one element for the United States to prove in order to prevail: whether USPCI, as a transporter, in fact selected the Hardage Site for the disposal of hazardous substances on at least one occasion.

## C. *Transporter Liability Under Section 107*

■ "Generator" liability under Section 107(a)(3) of CERCLA is imposed on "any person who by contract, agreement, or otherwise arranged for" disposal, treatment, or transport to a hazardous waste facility. 42 U.S.C. § 9607(a)(3) (Supp. V 1987). Courts have construed this section broadly. A generator need not have selected the site. *United States v. Wade,* 577 F.Supp. 1326, 1333 n. 3 (E.D.Pa.1983). Generator defendants can be liable for disposal of wastes at a particular site "even when defendants did not know the substances

would be deposited at that site or in fact believed they would be deposited elsewhere." *Aceto Agricultural Chems.,* 872 F.2d at 1381. As far as the waste is concerned, the United States must present evidence that a "generator defendant's waste was shipped to a site and that hazardous substances similar to those contained in the defendant's waste remained present at the time of release." *Monsanto,* 858 F.2d at 169 n. 15.

■ Liability of transporters is not as broad as the above-discussed generator liability. "Transporter" liability under section 107(a)(4) of CERCLA is imposed on:

> any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance....

42 U.S.C. § 9607(a)(4) (Supp. V 1987). Transporters are liable under CERCLA if they selected the particular site for disposal of hazardous substances. *United States v. South Carolina Recycling & Disposal, Inc.,* 653 F.Supp. 984, 1005 (D.S.C.1984), *aff'd in part, vacated in part on other grounds sub nom. United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir.1988).

■ The parties seek a determination by this Court of the correct meaning and scope of site selection under section 107(a)(4). 42 U.S.C. § 9607(a)(4) (Supp. V 1987). The United States argues that a transporter such as USPCI has selected the site. The United States asserts that where a transporter has an exclusive contractual arrangement with the disposal site, as USPCI did with Mr. Hardage, proposes to customers that wastes should be sent to that site, and then transports wastes to the site, the requirements for transporter liability have been met. The United States also contends liability may be imposed if the transporter at least actively participates in or assists in the site selection. The United States urges the Court to find USPCI liable for having selected the site, or at least for having participated in the site selection.

As authority for the argument, the United States cites: *United States v. Northeastern Pharmaceutical & Chem. Co.*, 579 F.Supp. 823, 846–47 (W.D. Mo.1984), *aff'd in part and rev'd in part on other grounds*, 810 F.2d 726 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *Bliss*, 667 F.Supp. at 1307; *South Carolina Recycling & Disposal*, 653 F.Supp. at 1005–06.

In addition, the United States contends that CERCLA created no exemption from liability for common carriers. However, if the Court were to find a common carrier exemption, the United States argues that USPCI did not act as a common carrier.[9]

USPCI urges the Court to continue its narrow interpretation of transporter liability and hold that a transporter can be liable only if it acted alone in selecting the disposal site.[10] USPCI argues that the Court should reject the United States' attempt to expand transporter liability to include a "participant in the selection standard." USPCI contends that if Congress had intended to extend liability to transporters who were "involved in" or "participated in" the selection of the disposal site, it would have done so. USPCI explains that none of the cases cited by the United States to support its argument involved transporters who were constrained by regulatory concerns and desires of their customers to dispose of waste only at lawfully permitted sites. United States Pollution Control, Inc.'s Trial Brief at 15 (Apr. 20, 1990) (filing No. 2631).

USPCI further contends that its decision to dispose of waste at the Hardage Site was the product of its common carrier permit allowing transportation only in Oklahoma, the fact that the Hardage Site was the only legally approved industrial waste site, and its customers' requirements that

disposal be lawful. Therefore, USPCI alleges it had but one choice. According to USPCI, site selection was made by a customer when it elected to contract with USPCI. Accordingly, USPCI requests that the Court find that USPCI did not select the site.

Here, the Court need not define the outer limits of transporter liability and need not determine whether the United States' contentions concerning the scope of transporter liability are correct. Here, USPCI: contracted with Mr. Hardage to use the Hardage Site for hazardous waste disposal prior to approaching any of the customers in question; proposed the Hardage Site to its customers as a location for hazardous waste disposal; determined whether certain customers' waste would be sent to injection wells as opposed to the Hardage Site; sent hazardous waste to the Hardage Site without the knowledge of, or instructions from, certain customers; and represented itself to at least one customer as the owner/operator of the Hardage Site. Finally, members of USPCI's senior management admitted under oath that USPCI did indeed select the Hardage Site for disposal of hazardous wastes on certain occasions. These circumstances satisfy CERCLA's transporter site selection requirement by any standard. The United States clearly met its burden of proof under 42 U.S.C. § 9607(a)(4) by showing that USPCI selected the Hardage Site for disposal of hazardous waste on at least one occasion.

## VIII. CONCLUSIONS OF LAW

1. USPCI is a transporter who accepted hazardous substances for transport to the Hardage Site and selected the site for disposal. *See* 42 U.S.C. § 9607(a)(4) (Supp. V 1987).

---

**9.** This Court previously ruled that Congress created no common carrier exemption from transporter liability. Order Granting in Part and Denying In Part Plaintiff's Motion for Partial Summary Judgment on Liability Under CERCLA Sections 106 and 107, at 34. To the extent USPCI attempts to reassert this argument at this trial, the Court again holds that Congress asserted no common carrier exemption from liability.

**10.** On August 25, 1989, the Court conducted a hearing on motions for summary judgment filed by third-party defendants Foster Feed and Seed, OKP, and Groendyke Transportation, Inc. The Court held that a transporter who contracted with a generator to transport hazardous substances to the Hardage Site was not liable under section 107(a)(4) of CERCLA when it did not select the site. *See* Hearing on Motions for Summary Judgment, Transcript at 22 (Aug. 25, 1989).

2. USPCI is jointly and severally liable for the response costs incurred by the United States in conjunction with the Hardage Site, together with the remedy to be ordered at the Hardage Site. *See* 42 U.S.C. §§ 9606(a) and 9607(a)(4) (1982 & Supp. V 1987).

## IX. CONCLUSION

For the reasons set forth above, the Court finds USPCI liable under sections 106(a) and 107(a)(4) of CERCLA. 42 U.S.C. §§ 9606(a) & 9607(a)(4) (1982 & Supp. V 1987). A partial judgment consistent with this Order, approved as to form only by all counsel, accompanies this Order.

IT IS SO ORDERED.