**UNITED STATES of America**

v.

**William M. DAVIS, et al.**

v.

**AMERICAN CYANAMID, et al.**

**No. 90–484.**

United States District Court, D. Rhode Island.

March 9, 1998.

filed on August 19, 1997 (docket No. 44).

Downs, Rachlin & Martin, P.C. by R. Bradford Fawley, David W. Gartenstein, Brattleboro, VT, for United Technologies Corp.

Lathrop & Gage by William G. Beck, Kansas City, MO, for Browning–Ferris Industries of Rhode Island.

McGovern, Noel & Benik by Gregory L. Benik, Providence, RI, for Radiac Research Corp.

## ORDER

TORRES, District Judge.

The recommendation contained in the Report of Magistrate Judge Lovegreen dated March 9, 1998, is hereby accepted.

## REPORT AND RECOMMENDATION

LOVEGREEN, United States Magistrate Judge.

In this matter brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq., Radiac Research Corporation (Radiac), a fourth-party defendant from which contribution is sought, filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56 which requests this Court find that it is not an arranger within the meaning of § 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3). The Contribution Plaintiffs [1] object and request this Court affirm that Radiac is an arranger and liable to UTC for contribution. A hearing was held on

February 26, 1998. Following my review of the legal memoranda, the oral argument and my independent research, I find that Radiac is not an arranger within the meaning of § 107(a)(3) of CERCLA and recommend that Radiac's motion for summary judgment be granted.

### Background

In the Second Amended Third Party complaint ("complaint"), UTC seeks contribution from Radiac under the theory that Radiac "is a person defined in CERCLA who arranged for the disposal or treatment of hazardous substances which were disposed of at the [Davis Liquid Waste] Site." Compl. at ¶ 56. Radiac contends it was not an arranger but was solely a transporter of waste to Chemical Control Company ("CCC"), a licensed waste disposal facility in New Jersey, and took no role in making arrangements or decisions to dispose of the hazardous waste at the Davis site or transporting the waste to the Davis site. Consequently, Radiac states it is a transporter within the meaning of § 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4). Radiac relies upon deposition testimony and an affidavit from two of its three founders and current officers. On July 17, 1996, Ellery Foley ("Foley") was deposed and stated he was a founder of Radiac in 1969 and remains with the company as vice-president although he still performs the waste collecting work with Radiac's customers; Radiac's principal place of business consists of a warehouse in Brooklyn, New York; Radiac disposes of radioactive and chemical hazardous waste but does not generate or treat any such waste; some materials would be taken to the Brooklyn warehouse and repacked with compatible materials; over the years, Radiac used several companies to dispose of waste including CCC located in Elizabeth, New Jersey; only bulk material would be taken to CCC; Radiac would go to its customer and pack the waste materials itself and then determine where the waste would be taken depending upon the type of waste material; Radiac personnel visited CCC's plant in 1972 and

1. The Contribution Plaintiffs consist of United Technologies Corporation (UTC), Clairol, Inc., Pfizer, Inc. and Ciba–Geigy Corporation. I will refer only to UTC, but this Report and Recommendation will affect all.

viewed its operations including its incinerator and were informed by CCC personnel that CCC could receive any type of chemical; in 1976 and 1977, Radiac used two companies, CCC and American Recovery and Chemical Control ("American Recovery") to dispose of waste; Radiac and CCC entered into a contract in 1972 for the disposal of waste; Radiac would pick up waste from New Jersey customers and drop it off at CCC on the way back to Brooklyn; Radiac never transported any waste to the Davis site.

Arthur Green, another founder of Radiac and secretary/treasurer, testified at deposition on July 18, 1996 that waste picked up at New York customers was taken back to the Brooklyn warehouse; it is uncertain whether any New York generated waste was taken to CCC but it was never taken to Rhode Island; Radiac personnel did not discuss with CCC its methods used to dispose of waste brought to the CCC facility. In an affidavit dated November 20, 1997, Green stated Radiac never generated or treated waste; during 1976 and 1977, Radiac delivered only bulk waste from New Jersey customers to CCC; Radiac did not possess the waste materials except for an occasional overnight stay at the Brooklyn facility on the trucks until it could be delivered to CCC the next business day; Radiac never offered advice or counsel to its customers regarding their waste; CCC was licensed by the State of New Jersey to incinerate waste at its facility; Radiac believed the waste brought by it to CCC would be incinerated or treated at CCC's facility and not shipped to another location; Radiac never transported any waste to the Davis site; and Radiac never selected, recommended, authorized or agreed to the Davis site for disposal of its customer's waste nor did it have knowledge that any such waste was being transported to the Davis site by others.

UTC, also relying upon the Foley and Green depositions, contends that Radiac assumed the responsibility for packaging, labeling and suitably transporting and storing its customer's waste until it reached the disposal site, either CCC or American Recovery; Radiac packaged the waste and what bulk waste it collected would result in Radiac's inspection of the containers and proper labeling;

only bulk waste (basically acids and solvents) received from customers would be taken to CCC but not all bulk waste was delivered to CCC; Radiac inspected the CCC facility before commencing disposal there; Radiac personnel met with William Carracino ("Carracino") who owned CCC; Radiac noted CCC had a thin film evaporator, neutralization tanks, and an incinerator; Radiac determined that CCC could accept almost any type of chemical waste; Radiac's customers were advised as to the disposal site for their waste if they inquired; in 1976 and 1977 Radiac used only CCC and American Recovery for disposal sites; CCC never picked up waste from Radiac—Radiac always delivered to CCC; Foley referred to Radiac as a "broker" in his deposition and defined the term "broker" as "someone who arranges a transaction between a client and somebody who is going to perform a service"; CCC was chosen in 1972 because it was being used by the "Federal EPA, the Federal FBI and New Jersey state DEP and everybody else and they had a good facility"; CCC was last used by Radiac in January 1978 because it was then shut down.

UTC also relies upon certain deposition testimony of William Carracino taken August 26, 1996. He stated that CCC was in the business of picking up waste and disposing of it; some waste material was received from Radiac and most of the Radiac waste material was taken to the Davis site; after CCC received the waste from Radiac, CCC would take it to the Davis site; Carracino could not recall how much waste or the type brought in by Radiac actually went to the Davis site, but some did. Carracino did not testify that Radiac knew some of the waste it brought to CCC was being taken to the Davis site. In fact, Carracino testified that CCC's personnel would "lie" to Radiac. Carracino depos. at 595.

UTC also disputes some of Radiac's material facts and states that Foley had extensive formal training in the disposal of hazardous waste going back to the 1950's; Green also had such training since 1963; Radiac was a broker and arranger for disposal of customer's waste; Radiac acted as a waste broker by packaging, transporting and arranging for

disposal of customer's waste; Radiac could have selected a disposal facility other than CCC; Radiac inspected the CCC facility on several occasions and chose CCC as part of a business decision and not at the request of any customer; CCC was chosen as a disposal site based upon its facilities and geographical location; Radiac generated and handled all of the paperwork necessary to dispose of waste at CCC and made all arrangements for the deliveries; Radiac supplied containers to its customers for solvent use; Radiac charged a flat fee for its materials and services; Radiac typically brought packing materials and containers to a customer, segregated the materials by hazard category, packed and labeled the waste, sealed the containers, prepared the necessary papers, loaded the waste and repeated the process at the next customer; it was Radiac's responsibility to package and label the waste properly, transport it and unload it at the disposal site; after the waste was loaded on Radiac's trucks, it was taken to the Brooklyn warehouse and segregated into different categories of material; CCC sent most of Radiac's waste to the Davis site; Radiac treated the waste obtained from its customers; and Radiac is not a mere transporter.

From the contentions of both Radiac and UTC and after my review of all depositions and the affidavit attached to the parties' memoranda, I have found the following facts which are not in material dispute:

Radiac was formed in 1969 by three individuals including Foley and Green. Each had experience in the hazardous waste handling business either from military service, prior employment or both. Radiac was established to take hazardous waste (mostly radioactive and chemical) from the premises of various customers (primarily hospitals, universities, research centers and a few manufacturing plants) principally in New York, New Jersey and Maryland and dispose of that waste at selected disposal sites in New Jersey and Maryland. The relevant time period in this case is 1976 and 1977. Radiac had six or seven employees, some trucks, vans only and no tanker trucks, and no holding tanks, at its warehouse/headquarters in Brooklyn, New York. Foley and Green would perform much of the waste collection work

with Radiac's customers. A typical customer would notify Radiac of waste to be picked up. Radiac would arrive at the customer, determine the type(s) of waste involved, package it in DOT-approved containers (various size drums), label it and load it on the truck. At times, customers would have bottles of waste and these would be labeled, placed in a container with vermiculite to protect the bottles, the container itself would be labeled and loaded on the truck. These were called lab-packs and were always taken to American Recovery for disposal. No lab-packs were taken to CCC for disposal. At times, Radiac would stop at CCC at the end of the day and drop a load of waste there. At other times, Radiac would bring the load of waste back to the Brooklyn warehouse and separate the containers by type of waste, then load it again and take it the next business day to either CCC or American Recovery in Maryland. Radiac did not generate or treat any waste. It did package it, label it and carry it on its trucks to a disposal site. This record does not indicate the amount of waste delivered to CCC by Radiac. CCC was chosen as a disposal site in 1972 by Radiac personnel following an inspection of its facilities. CCC had an incinerator which was the only one in that area. CCC was licensed by the State of New Jersey and was used by federal and state agencies for waste disposal. Radiac customers did not choose CCC. Radiac made the decision to dispose of waste at CCC and its customers would not know of the disposal site unless they asked. CCC transported some of the waste brought by Radiac to its New Jersey facility to the Davis site in Rhode Island. Radiac did not know that CCC was bringing any of its waste to the Davis site. Radiac was without knowledge as to what CCC did with the waste although it was assumed it was incinerated or otherwise treated at the CCC facility. Radiac did not transport any waste to Rhode Island. Radiac paid CCC a fee for disposal of the waste at the New Jersey facility. There was no release or threat of release of a hazardous substance at the CCC facility.

## Discussion

### I.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) states that a party shall be entitled to a

summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When determining a motion for summary judgment, I must review the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. *Mesnick v. General Electric Co.,* 950 F.2d 816, 820 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993); *Lawrence v. Northrop Corp.,* 980 F.2d 66, 68 (1st Cir.1992).

Summary judgment is a procedure that involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party meets this burden, the onus falls upon the nonmoving party, who must oppose the motion by presenting facts that show that there is a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing Fed.R.Civ.P. 56(e)); *see Goldman,* 985 F.2d at 1116; *Lawrence,* 980 F.2d at 68; *Garside,* 895 F.2d at 48 ("[A] 'genuine issue' exists if there is 'sufficient evidence supporting this claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.' ") (quoting *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976)). To oppose the motion successfully, the nonmoving party "may not rest upon mere allegation or denials of his pleading." *Anderson,* 477 U.S. at 256. Moreover, the evidence presented by the nonmoving party " 'cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' " *Mesnick,* 950 F.2d at 822 (quoting *Mack v. Great Atl. & Pac. Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989)). Indeed, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). Thus, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." *Goldman,* 985 F.2d at 1116 (citing *Anderson,* 477 U.S. at 249).

## II. *CERCLA, 42 U.S.C. § 9607(a)(3).*

In the complaint, UTC seeks contribution from Radiac under the theory that Radiac "is a person defined in CERCLA who arranged for the disposal or treatment of hazardous substances which were disposed of at the [Davis Liquid Waste] Site." Compl. at ¶ 56. UTC alleges that Radiac arranged with CCC for the treatment or disposal of hazardous waste, and is therefore subject to arranger liability as provided by 42 U.S.C. § 9607(a)(3). Arranger liability falls upon

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances,

. . . .

28 U.S.C. § 9607(a)(3). Unfortunately, the pivotal term "arranged" was left undefined. What's more, neither the Supreme Court nor

the First Circuit has yet to address substantively the scope of arranger liability. The three CERCLA decisions from this district are not particularly helpful because they deal exclusively with liability for the generation of hazardous waste, rather than with liability for arranging for its disposal, though both such covered persons are made liable under section 107(a)(3). *See Branch Metal Processing, Inc. v. Boston Edison Co.,* 952 F.Supp. 893, 912–14 (D.R.I.1996); *O'Neil v. Picillo,* 682 F.Supp. 706, 718 (D.R.I.1988); *Violet v. Picillo,* 613 F.Supp. 1563, 1576–77 (D.R.I.1985). It is undisputed that Radiac played no role in the production or generation of the hazardous waste at issue. Therefore, the following analysis will proceed by reference to lower court decisions from other jurisdictions attempting to define the parameters of arranger liability in situations analogous to the instant case.

Most courts agree that it is consistent with CERCLA's remedial purpose to interpret the loose language of section 107(a)(3) liberally and to extend liability beyond the typical manufacturer who hired a contractor to dispose of its waste at a site. Allan J. Topol & Rebecca Snow, *Superfund Law and Procedure* § 3.8 (1992 ed. & Supp.1996). Therefore, courts have concluded that a party need not have generated the waste to be found liable under section 107(a)(3). *United States v. Mottolo,* 629 F.Supp. 56, 60 (D.N.H.1984). For example, in *United States v. Parsons,* 723 F.Supp. 757 (N.D.Ga.1989), one of the defendants purchased a commercial building which contained several drums of waste. The new owner thereafter contacted a waste disposal company and paid for the proper disposal of the waste barrels. In a subsequent CERCLA action, the court held the defendant liable as an arranger under section 107(a)(3). *Id.* at 762. The court reasoned that liability attached either through ownership or through possession. Though ownership was in dispute, the court stated, "clearly [the defendant] possessed the drums and arranged with Techni–Clean to transport the drums elsewhere." *Id.* at 762. Other courts have reasoned that liability attaches when the defendant is under an obligation to dispose of the waste properly. "[I]t is the *obligation* to exercise control over hazardous

waste disposal, and not the mere ability or opportunity to control the disposal of hazardous substances that makes an entity an arranger under CERCLA's liability provision." *Gen. Elec. Co. v. AAMCO Transmissions, Inc.,* 962 F.2d 281, 286 (2nd Cir.1992). There the court went beyond the requirement of simple possession for the imposition of arranger liability. The Second Circuit reasoned that Congress "employed traditional notions of duty and obligation in deciding which entities would be liable under CERCLA as arrangers." *Id.* at 286. It was therefore untenable to hold AAMCO liable merely because it had the opportunity or ability to control a third party's waste disposal practices. *Id.* at 286.

However, in *United States v. Bliss,* 667 F.Supp. 1298 (E.D.Mo.1987), the court imposed arranger liability notwithstanding the fact that defendant had not generated the waste, did not possess the waste, and had no obligation with regard to the disposal of the waste. Instead, the court relied on the fact that the defendant had actively participated as a broker in the disposal of its customer's waste. The facts revealed that defendant's employees made transportation arrangements with its customer (the generator of the waste in question) while its district manager arranged with Bliss to carry out the disposal. *Id.* at 1303. Therefore, though unique because the defendant had not generated or possessed the waste, or had any obligation for the waste, liability rested on the fact that the defendant deliberately "had some actual involvement in the decision to dispose of [the] waste." *AAMCO Transmissions,* 962 F.2d at 286 (citing *Bliss,* 667 F.Supp. at 1306).

As to defendants similar to Radiac, "courts [have] held that entities that were only engaged in the transportation or shifting of hazardous wastes were not subject to arranger liability pursuant to section 107(a)(3) of CERCLA...." William B. Johnson, Annotation, *Arranger Liability of Nongenerators Pursuant to § 107(a)(3) of Comprehensive Environmental Response, Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C.A. 9607(a)(3)),* 132 A.L.R.Fed. 77, 103–04 (1996). For instance, in *U.S., State of Washington v.*

*Western Processing Co.,* 756 F.Supp. 1416 (W.D.Wash.1991), the court held that transporters could not be liable pursuant to section 107(a)(3) of CERCLA where the transporter had not selected the disposal site. "It was argued that they were persons who possessed hazardous wastes (by transporting wastes in their trucks) and arranged with other entities (waste generators and the operator of the disposal site) for treatment of hazardous wastes at a disposal facility or treatment facility (the site in question) owned and operated by another and containing hazardous substances." Johnson, *Arranger Liability of Nongenerators,* 132 A.L.R.Fed. at 105. However, the court concluded that transporter liability is provided for only in section 107(a)(4) and therefore rejected the argument that section 107(a)(3) applied. "[I]t requires labored parsing to conclude that this section [107(a)(3)] addresses transporter liability, particularly in view of section 107(a)(4) that clearly provides for transporter liability." *Western Processing Co.,* 756 F.Supp. at 1421. "[S]ection 107(a)(3) is not a CERCLA provision under which transporters may be liable." *Id.* at 1421.

Applying the foregoing patchwork to the case at bar, this court finds it difficult to imagine how Radiac could be properly characterized as an arranger under section 107(a)(3). Starting from the safest footing, it is undisputed that Radiac never generated any waste itself. Foley's and Green's deposition testimony and Green's affidavit state that Radiac never treated waste or produced any waste covered by section 101 of CERCLA, 42 U.S.C. § 9601. Therefore, liability, if any, must be premised upon the specific actions Radiac took either during transportation or in planning for the transportation of the hazardous waste in question. It is not disputed that Radiac took waste from several customers and disposed of some of that waste at CCC; that CCC was selected by Radiac, not the customer; and that Radiac never selected the Davis site or even knew that waste transported by it to CCC was thereafter being transported by CCC to the Davis site.

Employing a *Parsons*-like analysis, this court must look to see if there is evidence

that Radiac "possessed" the waste in question. Possession in this context requires more than possession during transportation. *New York v. SCA Servs., Inc.,* 844 F.Supp. 926, 928 (S.D.N.Y.1994) (holding defendant liable as an arranger where undisputed facts identified elements of possession and control over hazardous waste); *Western Processing Co.,* 756 F.Supp. at 1419–1421; *Parsons,* 723 F.Supp. at 762 (finding arranger liability where defendant had possession of drums of waste and was obligated to arrange for the clean up of his building). The facts in each case reveal that possession consists of holding or storing, at a site owned by the party, for an indefinite period of time. Such extended physical possession acts as the foundation for liability. Alternatively, using an *AAMCO Transmissions* analysis, the facts would have to support a finding of an obligation to dispose of waste properly. *AAMCO Transmissions,* 962 F.2d at 286 (concluding that CERCLA liability arose out of the obligation to exercise control over hazardous waste disposal). There is nothing in the record which would indicate Radiac held or stored waste thereby incurring a concomitant obligation to arrange for disposal. At best, Radiac, on occasion, took customers' waste to its Brooklyn warehouse for segregation into various types in order to transport that waste to the proper facility the next business day. Radiac had no tanker trucks and no holding tanks at its Brooklyn facility. It is undisputed that Radiac merely transported waste to CCC and never selected the Davis site.

UTC disingenuously tries to circumvent this problem by citing to the following portion of Foley's deposition testimony as an admission of Radiac's role as an arranger:

"Q. What would you actually be doing at Teledyne?

A. Primarily the same thing we do at Radiac. We go out, package the chemicals up, take them back and broker them off to people who did the final disposition. We did not open the bottles, we packaged it up."

Foley Dep. at 27.

"Q. Were you involved in the disposal of the hazardous materials that were being collected from your customers?

A.   As a broker."

Foley Dep. at 65.

"Q.   You used the word 'broker' before, what is your understanding of what a broker is?

A.   My understanding of what a broker is, a broker is someone who arranges a transaction between a client and somebody who is going to perform a service."

Foley Dep. at 78.

From this, UTC argues that Radiac has admitted it is a "waste broker" and responsible for "arranging" for the ultimate disposal of customers' hazardous waste. UTC's Opp. Mem. at 4. UTC takes this testimony out of context and from a lay person and then requests this Court to give it a legal meaning—an admission by Radiac that is was an arranger. I decline to do so. The facts in this matter show only that Radiac is a transporter within the meaning of section 107(a)(4) which provides in pertinent part:

> any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable . . . .

42 U.S.C. § 9607(a)(4).

Radiac accepted hazardous substances from various customers for transport to either CCC or American Recovery which facilities were selected by Radiac. However, there is no evidence in this record of any release or threatened release from CCC which caused the incurrence of response costs. The release came from the Davis site which was not selected by Radiac and to which Radiac never transported any hazardous substances.

As the prior case law establishes, arranger liability can only derive from some sort of obligation vis á vis the hazardous waste. In common speech, the word "arrangements" does not include an obligation requirement as it does under CERCLA. Therefore, I find that Foley's deposition testimony is taken out of context.

Last, the evidence in the record cannot support a finding of arranger liability under a *Bliss* analysis. In *Bliss*, arranger liability was imposed upon a waste broker which had exercised significant involvement in all of the relevant disposal decisions. In contrast, there is no evidence in the record that Radiac ever acted as a broker by actively counseling its customers on their waste disposal. Rather, the record reflects that Radiac responded to a customer's call for waste removal, that Radiac packaged and labeled the waste and then delivered it to an appropriate disposal site, many times on the same day. Therefore, there is no evidence in the record upon which a reasonable finder of fact could infer that Radiac operated as an "arranger" by brokering the disposal of its customer's waste. The case law cited by both sides supports this conclusion. Therefore, summary judgment should be entered for Radiac because there is no genuine issue of material fact which could support arranger liability under CERCLA.

I do not find that any other case cited by UTC is apposite to this issue as they involve facts not present in the instant matter.

### Conclusion.

For the foregoing reasons, Radiac's motion for summary judgment should be granted. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Fed.R.Civ.P. 72(b); Local Rule of Court 32. Failure to file specific objections in a timely manner constitutes a waiver both of the right to review by the district court, *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 605 (1st Cir.1980), and the right to appeal the district court's decision, *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986) (per curiam).